OSCEOLA LAND COMPANY *v.* HENDERSON.

Opinion delivered January 21, 1907.

REMOVAL OF CLOUD—LACHES.—A suit to recover a cloud on the title to land is barred by laches where defendants and those under whom they derive title have paid the taxes on the land for more than thirty years and made vast improvements thereon, while plaintiff and its grantor have slept on their rights until the land has become valuable.

Appeal from Mississippi Chancery Court; *Edward D. Robertson,* Chancellor; affirmed.

*Chas. T. Coleman* and *J. T. Coston,* for appellant.

1. The tax sale of 1893 was invalid.

2. Compare Arkansas and Illinois statutes on seven-year payment of taxes. Kirby's Digest, § 5057. 1 Wall. 638. The Illinois statute being the earliest enactment, the courts of that State have established the precedents for the construction of such legislation. Without exception such statutes are strictly construed, and it is held, (1) that a purchase at a tax sale, or a

redemption, will not be treated as a payment, and (2) that the payment must be made by, and in the name of, the holder of color of title.   53 Pac. 426; 47 Ill. 21.   If it be conceded that, instead of buying the land, Driver actually paid the taxes, such payment by him, he having no color of title, could not inure to the benefit of Henderson, who did have color of title.   26 Ill. 525; 109 Ill. 101; 23 Ill. 392; *Id.* 512; 26 Ill. 521; 129 Ill. 30; 20 Ill. 403; 19 Ill. 385; 107 Ill. 403; 183 Ill. 548; 133 Ill. 313; 47 Ill. 480; 30 Ill. 327; 46 Ill. 521; 45 Ill. 391; 87 Ill. 259.

3.   The record affirmatively shows that the seven payments were not made by defendants and those under whom they claim.   Being a record required by law to be kept by the clerk and the evidence of what was done at a tax sale, it could not be contradicted by parol testimony.   61 Ark. 42.   If the record can not thus be contradicted, the court can not consistently permit a payment to be proved, in the face of a record which shows that there was no payment, but a sale; especially where the effect of such testimony is to take the title from the plaintiff and vest it in the defendant.   21 Ill. 462; 88 S. W. 567.

*G. W. Thomason, J. D. Block* and *W. J. Driver,* for appellees.

1.   In this case the plaintiff must proceed upon the strength of its own title, and not the weakness of the defendants'.   37 Ark. 46-83; 75 Ark. 312.   A fatal defect exists in appellant's muniments of title, in this:   the decree mentioned as the third muniment, which authorized Jarnigan, as guardian and trustee, to sell and convey the land in controversy, directed a report of the sale to be made by him to the court.   This report recites a sale to Wm. H. Chatfield, trustee, and was confirmed, and the guardian and trustee was directed to convey the lands to him. No conveyance was made to Chatfield, but was made to John J. Mitchell, as is shown by appellant's fourth muniment of title. These defects can not be cured by the decree of the Mississippi Chancery Court rendered in 1899 in an action between Haggart & McMasters *v.* A. H. Chatfield, trustee, and Mary C. Gilbert, reciting that John J. Mitchell was the purchaser, and that the report of the guardian that Chatfield was the purchaser was

a clerical misprision. Nowhere in appellant's chain of title does it appear that Haggart & McMasters have ever had or claimed title to the lands in controversy; and the record discloses that, at the time this decree was rendered, H. R. Allen was a claimant under the Jones title, and C. E. L. McCauley was a claimant under a tax title, that neither of them was made a party to the suit, and they are not mentioned in the decree. In so far as it seeks to affect the lands in controversy, the decree is a nullity and subject to attack, either directly or collaterally. 49 Ark. 397; 58 Ark. 181; 59 Ark. 483; 60 Ark. 369; 62 Ark. 439; 34 Ark. 291.

2. The owner of land can show actual payment of taxes; and, in so far as may be necessary in so doing, contradict the record showing of a sale. 35 Ark. 585; 51 Ark. 397; 19 Ill. 183; 26 *Id.* 507; 80 *Id.* 183.

3. Payment of taxes by the holder of the vendor's lien inured to the benefit of appellees. The holder of a vendor's lien is, in contemplation of law, a mortgagee. 14 Ark. 628; 60 Ark. 595. By virtue of their liens and the relation created thereby, Driver & Thompson and Hale & Crenshaw were charged with the duty of paying the taxes on the land, and precluded from purchasing at a tax sale. 2 Cooley on Tax. (3 Ed.) 708; 30 Ark. 453; 73 Ark. 45. See, also, 70 Wis. 111; 73 Ia. 423; 89 Cal. 196; 109 Cal. 268.

4. Under the doctrine of laches appellant's claim is barred. At no time from the year 1879 to the year 1903 did appellant and those under whom it claims pay taxes on these lands, or assert any claim or title thereto. It is apparent that appellant and its immediate vendors regarded the claim as a merely speculative one. Equity will not permit them to remain idle, refuse to pay the taxes lawfully assessed against the land, and speculate upon its enhanced value at this late day. 94 U. S. 159; 120 U. S. 534; 160 U. S. 237; 178 U. S. 207; 42 Ark. 289; 55 Ark. 85; 60 Ark. 50; 75 Ark. 312; 120 Fed. 893.

*J. T. Coston* and *Murphy, Coleman & Lewis,* for appellant in reply.

1. If the sale made pursuant to the original decree named as appellant's third muniment of title was actually made to

Mitchell, instead of Chatfield, as stated in the .guardian's report, and the sale was confirmed, though the name of the purchaser was erroneously stated in the report, this vested the equitable, if not the legal, title in Mitchell, and that is sufficient for the purposes of this suit. 77 Ark. 242. The heirs of Wm. H. Chatfield were duly notified, appeared by attorney, and consented to the *nunc pro tunc* order correcting the record so as to show that Mitchell was the actual purchaser. The court had plenary power to make this correction by *nunc pro tunc* order. 1 Black on Judgments (2 Ed.), § 161; 33 Ark. 475; 9 Ark. 185; 45 Ark 240; 40 Ark. 224; 105 Wis. 323; 50 Mo. 145; 123 N. Y. 520. It may correct a clerical misprision with respect to the names of parties on its own motion at any time, and it is always in the power of the court, even after adjournment of the term, to correct a mistake in the entry of its own judgment. 33 Ark. 218; I Black on Judgments (2 Ed.), § 155; *Id.* § 160; 51 Ark. 287; 24 Wis. 477; 16 Fed. 708; 43 Mo. App. 168; 9 Col. App. 41; 90 Mich. 270; 68 Wis. 248; 62 Minn. 498; 17 Am. & Eng. Enc. of L. (2 Ed.), 818; 33 Cal. 480; 63 Tex. 435; 41 Ala. 292; 8 Mont. 305; 75 Ark. 12. Appellees were not parties to the proceedings to correct the record, could not have objected to the order if they had been present, and were not entitled to notice. 136 Fed. 27. The *nunc pro tunc* decree was admissible against the appellees for the purpose of making out a chain of title. 35 Ark. 321.

2. The sole ground set up in the answer upon which appellees seek to base the application of the doctrine of laches is that appellees have paid the taxes for a number of years. This is not sufficient. 75 Ark. 194; 70 Ark. 256; 50 Ark. 390; 45 Ark. 81.

RIDDICK, J. This action was brought against the defendants by the Osceola Land Company to quiet its title to 1,280 acres of wild and unimproved land in Mississippi County in this State.

In this complaint plaintiff alleges that in February, 1879, the State of Arkansas by its patent conveyed the land in controversy to W. A. Jones. The chain of title under which plaintiff claims the land commences with this conveyance from the State to Jones in 1879. This patent from the State to Jones is

not set out in the record, but there is an agreement of counsel in the following words: "That the abstract of title to the lands in controversy be and the same is hereby agreed to be used in evidence as the evidence of the title under which the lands are claimed in lieu of copies of such records as may pertain to same and which may be mentioned in said abstract of title."

Counsel for defendant by this agreement seems to have admitted that the State by its patent conveyed this land to W. A. Jones in 1879, yet, if we concede that plaintiff holds by mesne conveyances from W. A. Jones, there is still no allegation and nothing to show the nature of this patent from the State or the recitals therein, nor is there any allegation or evidence to show that the State was the owner of the land at the time it was conveyed to Jones. Defendants in their answer allege that these lands were entered by W. A. Jones about 1858, and that he received a certificate of purchase therefor from the State; that afterwards for a valuable consideration he transferred the certificate of purchase to W. C. Davie; that Davie conveyed the land to Rice Stewart, who paid taxes on the land continuously from 1858 down to the year 1892, when Stewart died. In 1893 the land was sold for the non-payment of the taxes for the year 1892, and purchased by C. E. McAuley, under whom defendants hold.

Taking these two opposing chains of title set up by plaintiff and defendants in connection with the agreement of counsel above referred to, we may assume that the State did own this land, and that W. A. Jones, under whom plaintiff claims, purchased it from the State sometime about 1858, and that afterwards in 1879 a patent was issued by the State to Jones conveying him the title. But the lands became subject to taxation so soon as they were purchased. The evidence shows that they were on the tax books in 1872, and that one Rice Stewart claimed these lands and paid taxes on them from that date down to 1892, when, as before stated, the lands were forfeited for taxes and purchased by C. E. McAuley. McAuley and those holding under him paid the taxes from the time of his purchase down to 1901. The facts in reference to the discharge of the taxes of 1901 is as follows. The father of defendants died some months after the taxes for that year became due, and on account of his sickness or for some other reason the taxes were not paid

before the day of the sale of land for non-payment of taxes. But Hale and Crenshaw, who, as shown hereafter, claimed under McAuley, held a vendor's lien on the land for half the purchase price which the ancestor of defendant agreed to pay them, and in order to protect their interests Mr. Hale of that firm requested Driver and Thomason, from whom they had purchased the land, and who held a vendor's lien on it for unpaid purchase money, to attend the sale, and, if the taxes were not paid, to pay them. There is record evidence tending to show that the lands were offered for sale, and were struck off to Driver and Thomason for the amount of the taxes, penalty and costs. The money to make this purchase was furnished by Hale and Crenshaw, Driver and Thomason only acting as their agents in the purchase. The testimony of both Driver and Hale shows that the intention was simply to pay the taxes to protect their interests and that of the defendants. Without deciding that this purchase of the land at tax sale was, under the circumstances, a payment of taxes within the meaning of the act of 1899, which declares that those who pay taxes on wild and unimproved land under color of title shall be deemed to be in possession of same, it was, as between the defendants and their vendors who made the purchase, nothing more than a payment of taxes. The defendants and those under whom they claim also paid the taxes for 1902. In July, 1903, the plaintiff made application to redeem these lands from the tax sale of 1902, and in 1904 it paid the taxes for 1903, and in August of that year commenced this action to cancel the title under which defendants claim.

The plaintiff does not claim title under Rice Stewart, and his payment of taxes for twenty years previous to 1892 was made under a claim of title adverse to its claim. From 1892 up to 1903, as we have shown, the taxes on these lands have been discharged by defendants and those under whom they hold. It thus appears that for thirty years previous to 1903 neither the plaintiff nor those under whom it holds paid any taxes on these lands. The lands remained wild, unimproved, remote from railway lines and of little value up to about 1896. After that date the evidence shows that there was a considerable rise in value. Mc-Auley in 1893 purchased this land for the taxes of 1892, being less than one hundred dollars. In 1900 he sold it to John B.

Driver, and Driver sold a half interest to Thomason for $1.50 per acre, being nearly two thousand dollars. About a year later these parties sold the land to Hale and Crenshaw for several times that amount, and they in turn sold to the ancestor of defendants for a price amounting to several thousand dollars. At the time these sales were made neither the plaintiff nor those under whom it holds had paid any taxes on the land for over a quarter of a century, and apparently had abandoned all claim to the land, either because it doubted the justice of its claim, or, what is more probable, because it thought that the lands were not worth the taxes that were assessed against them.

But in recent years vast improvements have been made affecting the value of these lands. Levees have been built protecting them from overflow, railways constructed, making the timber upon them accessible to market, and plaintiff and those under whom it holds, after sleeping on their rights for a quarter of a century, have awakened to the fact that these lands are valuable. But the long and continued neglect of the plaintiff to pay taxes upon or assert any claim to the lands was calculated to make those parties who dealt with and purchased these lands from other claimants believe that if those under whom plaintiff claims ever had any title to the land, they had long since abandoned all claims thereto. Under this belief they invested considerable sums of money in purchasing these lands, and we are of the opinion that plaintiff is not in a position to ask a court of equity, which aids the vigilant but discourages the enforcement of stale claims, to aid it in cancelling the title of defendants.

This question was discussed in the case of *Turner* v. *Burke, ante* p. 352, where under somewhat similar circumstances this court held that the plaintiffs were barred by laches.

In discussing a question of this kind in a recent case the Supreme Court of the United States said: "One who, having an inchoate right to property, abandons it for fourteen years, permits others to acquire apparent title, and deal with it as theirs, and as though he had no right, does not appeal to the favorable consideration of a court of equity. We need only refer to the many cases decided in this court and elsewhere, that a neglected right, if neglected too long, must be treated as an

abandoned right which no court will enforce.  *·  *.  *   There always comes a time when the best of rights will, by reason of neglect, pass beyond the protecting reach of the hands of equity, and the present case fully illustrates that proposition." *Moran v. Horsky,* 178 U. S. 205.   See also *Galliher* v. *Cadwell,* 145 U. S. 368; *Felix* v. *Patrick,* 145 U. S. 317; *Meyer* v. *Johnson,* 60 Ark. 50.   It is true that mere delay does not, of itself, bar the plaintiff.   "Laches in legal significance is not mere delay, but delay that works a disadvantage to another.   So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has in good faith become so changed that he can not be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as estoppel against the assertion of the right.   This disadvantage may come from loss of evidence, change of title, intervention of equities and other causes; for where the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief." *Chase* v. *Chase,* 20 R. I. 202; 5 Pomeroy, Equity, § § 21-23.

It has become a maxim of the law that "equity aids the vigilant, not those who slumber on their rights."   It was said by a distinguished judge in an old case that "a court of equity  *  *  *  has always refused its aid to stale demands, when the party has slept upon his rights and acquiesced for a great length of time."   "Nothing," said he, "can call forth this court into activity but conscience, good faith and reasonable diligence." Lord Camden in *Smith* v. *Clay,* 3 Brown, Ch. 638.

There are other defenses set up by defendants, but it is unnecessary to consider them, for the reason that we are of the opinion that the plaintiff and those under whom it holds title have been guilty of such laches that the chancellor was, on that ground alone, justified in refusing the relief prayed and in dismissing the complaint for want of equity.

Judgment affirmed.