696 P.2d 891

**H. Reynold GEORGE and Dennis L. George, Plaintiffs-Appellants, Cross-Respondents,**

v.

**Nyle TANNER and Cheryl Tanner, husband and wife, Defendants-Respondents, Cross-Appellants.**

No. 13434.

Supreme Court of Idaho.

Feb. 28, 1985.

Ronald S. George, Pocatello, for plaintiffs-appellants, cross-respondents.

Lowell N. Hawkes, Pocatello, for defendants-respondents, cross-appellants.

1982 Opinion No. 84, Issued September 30, 1982, is Hereby Withdrawn and this Opinion Substituted Therefore.

HUNTLEY, Justice.

This is an appeal by H. Reynold George and his brother, Dennis L. George, from a judgment in favor of Nyle and Cheryl Tanner, quieting title to business property in the Tanners. The Tanners cross-appeal from that portion of the judgment which awarded a money judgment to the Georges on the basis of unjust enrichment.

The Georges owned a theater in Rigby, Idaho, while Tanners owned an adjoining cafe and apartments. In 1970 the Georges sold the theater to the Tanners on an installment contract for $50,000. In 1976 Tanners sold the cafe on an installment contract to Mr. Webb Evans and his corporation. At that time the Tanners still owed approximately $40,000 to the Georges on the theater contract. Shortly thereafter the Georges and Tanners entered into an assignment, the terms of which purported to "sell, assign and transfer and set over unto [the Georges] all our right, title and interest in and to that certain balance of

$150,000 as set forth in that certain contract of sale," that is, the cafe contract between Tanners and Webb Evans. The purpose of this assignment was testified to be to cancel the debt on the theater contract owed by Tanners to Georges in exchange for approximately $50,000, (constituted by the assignment of the $150,000, of which $100,000 was to be paid under escrow arrangements to retire a bank mortgage on the cafe). The sum of $20,000 which was to be paid by Evans to Tanners as a "downpayment" on the cafe under the contract was also not assigned. After four monthly payments Evans defaulted. At that point major repairs and replacements were needed in the cafe, and its major liabilities totalled approximately $105,000. The cafe property appeared to have no value in excess of the underlying mortgage.

The parties had a number of discussions on what to do, but could not reach any agreement. The Tanners offered to sell their interest in the property to the Georges for $20,000 and at one time offered to relinquish their interest in the cafe to the Georges if the Georges would assume the liability of the underlying mortgage. Reynold George rejected Tanners' offers, consistently disclaimed any interest in the property, stating that he wanted nothing to do with it, and indicated that he and his brother would pursue their remedies against Evans and the Evans' corporation. Because the Tanners were personally liable on the outstanding loans on the property, they made efforts to find renters for the cafe and keep it open. They made substantial expenditures for repairs, mortgage payments, taxes and other expenses. The cafe lost money for some time after Evans defaulted but at the time of trial it appeared that through the Tanners' efforts, it was once more a going business with a value in excess of the mortgage.

The Georges determined that Evans' corporation had filed a petition for bankruptcy, and that Evans as an individual did not possess assets sufficient to enable him to respond to a judgment on the installment sales contract. In February 1978 the Georges filed the instant action seeking to quiet title to the cafe on the basis that the cafe was security for the assignment of the installment sales contract.

The trial court found that under the assignment the Georges had the right to look to the cafe as security upon default, but held that they were barred from asserting that right by the Tanners' equitable defenses of laches and estoppel. Accordingly, the trial court quieted title in the cafe to Tanners. On the ground that Tanners had been unjustly enriched by now holding clear title to the theater, the trial court awarded the Georges a compensatory award of $22,686.[1] Both parties appealed. This court heard the appeal, and issued its opinion on September 30, 1982. A petition for rehearing followed.

This case turns on whether the assignment from Tanners to Georges was:

(1) an assignment of an account receivable, or;

(2) a partial assignment of all of the seller's various rights under a contract of sale, including the right to foreclose on the real estate.

If the former, the Georges would have had no remaining interest in the property after Evans' default on the contract, and the trial court's award of $22,686 to Georges should be reversed.

---

1. Because of the Georges' $50,000 interest and Tanners' $20,000 interest in the contract proceeds, the trial court found that the Georges had a 5/7 interest in the cafe proceeds, and the Tanners a 2/7 interest. At the time of trial the cafe was valued at $150,000, of which $100,000 was encumbered by mortgages, back taxes and assessments. Of the $50,000 equity, the trial court held that Georges would have been entitled to 5/7, or $35,700, and Tanners to 2/7, or $14,300. Tanners were awarded $500 per month for 2 years ($12,000), plus $513.33 in expenditures from Georges' interest to compensate for Tanners' efforts and expenditures on the cafe. This leaves $35,700 − $12,513.33 = $23,186.67. (The trial court's calculation appears to have been $500 too low.) The relative interest between the parties, then, is $23,186.67 or 43.67% in the Georges, and $26,813.33 or 53.63% in the Tanners.

If the latter, the Georges would have an interest in the cafe which is proportionate to their interest in the contract, because both parties would have had the right to foreclose under the terms of the contract. Under this scenario, when Evans conceded default, obviating the need for a foreclosure action, the Georges and the Tanners became co-owners.

The difficulty here is that the trial court made no explicit finding of fact or conclusion of law as to which characterization of the assignment is proper. However, implicit in the trial court's result is a resolution of the issue in favor of a contract interest when it made a finding of a respective $5/7$ and $2/7$ interest in the parties. The trial court found that the assignment provided that the theater contract was cancelled in exchange for Georges receiving all right, title and interest of Tanners in the contract with Evans. The trial court also found that Georges had a right to look to the cafe as security.

■ In its Memorandum Decision the trial court ruled that the defenses of laches and estoppel could be applied to divest a co-owner of his interest in real estate. We reverse; the law of co-tenancy does not, absent an agreement to that effect, forfeit a co-tenant's interest in property by reason of unwillingness or inability to share in protecting the co-owned interest. *See Hawe v. Hawe*, 89 Idaho 367, 406 P.2d 106 (1965); *Dimmick v. Dimmick*, 58 Cal.2d 417, 24 Cal.Rptr. 856, 374 P.2d 824 (1962); *Hunter v. Schultz*, 240 Cal.App.2d 24, 49 Cal.Rptr. 315 (1966).

■ As to the award of compensatory damages to Georges on the grounds of unjust enrichment, we must also reverse. When the Tanners were deeded the theater in exchange for assignment of an account receivable or of the contract of sale, Georges relinquished their right to receive $40,-000 under the theater contract in exchange for the right to receive $50,000 payable over a shorter time and at a higher rate of interest. Both parties entered into the contract voluntarily, at arms length, with full knowledge and in good faith. Had Evans not defaulted, the Georges would have made at least a $10,000 profit. The Tanners were not unjustly enriched by the transaction. The doctrine of unjust enrichment does not operate to rescue a party from the consequences of a bargain which turns out to be a bad one. The theater contract was irrelevant to the resolution of the post-default interests of the parties in and to the cafe.

■ The trial court's findings that the Georges have a $5/7$ interest and the Tanners have a $2/7$ interest is supported by the evidence. However, having concluded that the parties are in a co-ownership situation, it was inappropriate for the trial court to order one party to buy the other out. Rather, the appropriate relief would be to order either sale or partition if the parties do not agree to an alternative mutually acceptable resolution.

On remand the trial court should take testimony to determine any offsets or reimbursement necessary (in addition to those items referenced in footnote 1 herein) to compensate those parties for their efforts and expenditures incurred in preserving or developing the property since the date of the June 29, 1979 judgment.

The trial judge, the Honorable Arthur P. Oliver, has now retired from the bench. In order that the proceedings on rehearing might be limited to additional or explanatory evidence, rather than a retrial of the entire case which could be subject to Rule 40(d)(3), we recommend that the Administrative Judge of the Sixth Judicial District ascertain whether Judge Oliver would be willing to conduct the further proceedings.

Costs to be divided equally; no attorneys' fees awarded.

DONALDSON, C.J., and BAKES, J., concur.

SHEPARD, J., dissents without opinion.

BISTLINE, Justice, dissenting.

That I do not join an opinion whereby Justices Donaldson and Bakes join Justice Huntley in withdrawing the opinion for the

Court which was released almost 30 months ago should not come as any great surprise. The opinion of September 30, 1982, was premised entirely on the *unchallenged* finding of the trial court that the Georges and the Tanners, in cancelling the debt created by the theater contract as consideration for the Georges' acquiring $50,000 of "principal" payments due on the Evans contract with the Tanners retaining $20,000 of "down" payments, respectively acquired five-sevenths and two-sevenths ownership interest in the security afforded by the title-retaining aspects of the Evans contract. Not only did neither party challenge the trial court in that respect, but the testimony presented to the trial court adequately supported such determination. Today, almost three years later, it is said in the new opinion for this Court that the trial court failed to explain its characterization of the assignment, but, so it is also said, implicit in the result reached "is a resolution" that the parties had acquired respectively a five-sevenths and two-sevenths interest, and both had a "right to look to the cafe [real and personal property] as security." In short, this new version of the 1982 opinion for the Court affirms the trial court on an issue which was not challenged by either party—which may seem to some to be indeed a remarkable display of appellate circumspection.

The main thrust of the Georges' first appellate brief (February 25, 1980) was the contention that there were no principles of estoppel which operated to deprive the Georges of their five-sevenths interest in the security devices of the title-retaining Evans contract. Relying on *Boesiger v. Freer*, 85 Idaho 551, 381 P.2d 802 (1963), an opinion authored by Idaho's most outstanding jurist in recent years, which opinion was joined by the other members of the Court, the Georges pointed out the simply inescapable fact that critical elements of the doctrine of estoppel were missing. Justice Knudson also authored *J.R. Simplot v. Chambers*, 82 Idaho 104, 350 P.2d 211 (1960), another unanimous opinion which dealt with equitable estoppel. In the *Simplot* case, the Court said this:

The essentials of an equitable estoppel have frequently been announced by this Court to the effect that a party claiming to have been influenced by the conduct or declaration of another to his injury, was himself not only destitute of knowledge of the state of the facts, but was also destitute of any convenient or available means of acquiring such knowledge; and that, where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel. *Cahoon v. Seger*, 31 Idaho 101, 168 P. 441; *Charpentier v. Welch*, 74 Idaho 242, 259 P.2d 814; *Sullivan v. Mabey*, 45 Idaho 595, 264 P. 233. In the case of *Little v. Bergdahl Oil Co.*, 60 Idaho 662, 95 P.2d 833, 837, this Court said:

> "In order to constitute an equitable estoppel there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice."

*Simplot, supra*, at 113, 350 P.2d at 220. In the *Boesiger* case the Court expanded on the doctrine. Before turning to *Boesiger's* language, however, it is well to note that this Court, although differently constituted than the *Boesiger* Court, has recently reaffirmed *Boesiger* in *Hoffman v. S.V. Co., Inc.*, 102 Idaho 187, 628 P.2d 218 (1981), an opinion not available to the trial court in deciding a case in 1979. In *Hoffman* we agreed with the trial court that elements there missing were "knowingly false statement or concealment of material fact." 102 Idaho at 192, 628 P.2d at 223.

In *Boesiger* the Court was more exhaustive:

> Respondent strenuously urges that all the elements necessary to equitable estoppel are present in this case. Since

granting a rehearing additional briefs have been furnished dealing with the doctrine of equitable estoppel. A proper consideration of respondent's contention requires that it be determined whether the facts necessary to constitute estoppel were proved at the trial.

Equitable estoppel is defined in 19 Am. Jur. 634, § 34, as follows:

"Equitable estoppel or estoppel in pais is a term applied to a situation where, because of something which he has done or omitted to do, a party is denied the right to plead or prove an otherwise important fact. Any more exact or complete definition than this is difficult to formulate for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently, any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. The cases themselves must be looked to and applied by way of analogy rather than rule. Equitable estoppel or estoppel in pais is the principle by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed."

This Court has, upon a number of occasions, stated the essential elements of equitable estoppel. In *Charpentier v. Welch*, 74 Idaho 242, 259 P.2d 814, this Court, while discussing estoppel, quoted with approval from 19 Am.Jur. § 42, pp. 642 and 643, as follows:

"The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially."

*Boesiger, supra,* 85 Idaho at 558–59, 381 P.2d at 809–10.

The Georges' brief did not overstate the mystery of the missing elements, and I see no reason to rewrite it:

1. There was no conduct on the part of respondents which amounted to a false representation or concealment of material facts. There was no evidence present at trial that respondent said anything that was false or in any way intended to mislead respondents. The court found only that appellants at first wanted nothing to do with the management of the cafe but later asserted their rights in the cafe. Appellants later asserted their rights in the cafe only because no other solution could be negotiated.

2. There was no intention by appellants that a misrepresentation be acted upon by respondents.

3. Respondents had no lack of knowledge of the true facts in question.

4. There was no reliance by respondents upon appellants' conduct to their detriment.

Appellants' Brief, p. 11.

And, in so urging, the Georges were on sound legal ground. The Georges were guilty of no act of misrepresentation, nor of any non-disclosure. They made no promises, and Mr. Tanner himself testified that he did not at any time request of the Georges that they make a specified monetary contribution toward the effort of salvaging the cafe venture. Quite the contrary, the Georges apparently viewed the situation as hopeless, and were resigned to losing their investment if it came to that. On the other hand, the Tanners were personally obligated to the bank on the mortgages against the cafe property, and stood to lose more than just the cafe property if it were not salvaged. And salvage it they did—without any help from the Georges. But, fortunately for all concerned, the lady who had managed for Evans continued on. When she left, another good manager took over. Unfortunately for the Tanners, all of this took place without their having exacted any commitment out of the Georges, either by way of signing off, or promising to contribute. In sum, although the Georges may have been guilty of passively going along for a free ride, the Tanners took no action to prevent it. But the Georges did nothing whatever for which they could be held estopped from owning what the trial court declared that they did own. The real problem in the case was the failure of the parties to provide the trial court with a considerable body of Idaho law which declares estoppel unavailable as a means of divesting ownership of real property, or an interest therein. This Court on the appeal could have decided the narrow issue presented, i.e., was the trial court justified in applying estoppel principles against the Georges, or, otherwise put, did the Tanners' Little Red Hen theory carry the day? Justice Shepard thought that it did.

A majority of the Court, however, were seemingly of the view that it would be ill-considered to decide whether an estoppel was justified on the facts of the case, when the larger and more important issue at stake was whether an estoppel is ever applicable as a remedy by which ownership to real property may be divested. Accordingly, after a considerable expenditure of time and effort, the author of the 1982 opinion concluded that such could not occur, and that view was sustained by a majority of the Court. Justice Shepard did not disagree, in theory at least, as I read his opinion, but he was of the view that an estoppel had been factually established, and the Georges had not claimed below that principles of laches and estoppel were inapplicable.

Today, 30 months after our 1982 opinion, the author of today's opinion writes:

"[T]he law of co-tenancy does not, absent an agreement to that effect, forfeit a co-tenant's interest in property by reason of unwillingness or inability to share in protecting the co-owned interest. *See Hawe v. Hawe*, 89 Idaho 367, 406 P.2d 106 (1965); *Dimmick v. Dimmick*, [58 Cal.2d 417, 24 Cal.Rptr. 856] 374 P.2d 824 (Cal.1962); *Hunter v. Schultz*, [240 Cal. App.2d 24] 49 Cal.Rptr. 315 (1966).

It is gratifying, personally to the author of the 1982 opinion, to be apprised that that earlier majority opinion correctly researched and read the law established in the *Hawe* case, and cases therein relied upon. Out of six justices who have been concerned with this case, the score stands at least not less than five to one that this Court has correctly and now consistently ruled that an estoppel cannot be utilized to forfeit an interest in real property. The litigants, one may be certain, would have been, win or lose, gratified to have had this Court some 28 months ago stand pat on the September 1982 opinion—of which today's opinion for the Court is in nearly all respects but a revamped version.

In one aspect only is it different. That has to do with the issue of unjust enrichment. Where we are once again nearly unanimous that the trial court erroneously applied equitable principles of estoppel so as to divest the Georges of their real property interest in the security of the title-retaining contract, it simply makes no sense to discuss unjust enrichment. Where the Georges are being restored to that which the trial court erroneously took from them,

*a fortiori*, the Tanners are no longer enriched, justly or unjustly, at the Georges' expense.

I am wholly unable to comprehend Justice Huntley's statement that "it was inappropriate for the trial court to order one party to buy the other out." The trial court did no such thing. Having erroneously held the Georges estopped from asserting title to their five-sevenths interest in the Evans contract, and upon the realization that the Tanners had been thus afforded a judicial windfall, the court did equity by applying "the equitable principle of unjust enrichment" (R., p. 56)—hence, the monetary judgment in favor of the Georges whereby they would receive from the Tanners "the sum of $22,687.67 payable at $300 per month with interest at 6% per annum." R., p. 63.

Similarly, I am unable to understand Justice Huntley's view as to what should occur on remand. Footnote 1 of Justice Huntley's opinion correctly states how the trial court arrived at the award for unjust enrichment—but is not relevant for purposes of bringing the controversy to a conclusion. Under well-accepted legal principles which were carefully laid out in the 1982 opinion for the Court, the Tanners may properly assert a claim against the Georges for what is claimed due from the Georges as non-contributing co-tenants in the cafe property, and, if not satisfied, can properly pursue their remedy in this action—in which eventuality the Tanners should be allowed to file a supplemental complaint with proper and necessary allegations which will support a prayer for proper relief, as was outlined in the superseded 1982 opinion. Unfortunately, the directions on remand set forth in Justice Huntley's opinion, wholly unsupported by any citation of authority, can only serve to befuddle the litigants and muddy this area of the law. Judge Oliver, in striving to conclude this controversy back in 1979, absent any input from counsel on the inapplicability of laches and estoppel as a means of divesting ownership of real property, or interest therein, in his Memorandum Decision, R.,

pp. 50–56, came extremely close to the proper remedy:

> In search for an equitable result, the Court has thought of several possibilities;
>> (1) Require defendants to resume payments on the original theatre contract.
>
> The problem with this is, that it puts plaintiff in exactly the position he was in prior to the transactions, after defendants have survived the risk situation.
>> (2) Award plaintiffs some lump sum in satisfaction of their interest.
>
> However, such a point was not suggested, argued or briefed by plaintiffs.
>> (3) Deny defendants' equitable defenses and allow the plaintiffs the property—setting off to defendants some restitution for the improvements, expenditures and services rendered during the two (2) years since default.
>> (4) Give the parties a pro rata share in the present equity of the cafe, with allowances made for defendants' efforts to salvage the business.

His proposition (4) was the correct answer, although, as I intimate above, the better practice would be first to require that the Tanners first submit a billing to the Georges of their claim for reimbursement. Such might be the end of the controversy if the Georges respond by making payment. If not, and because equity retains jurisdiction of an action until it is fully resolved, a supplemental pleading should be allowed. *See Clark v. Olsen* (Idaho Sup.Ct. No. 15265, issued Feb. 14, 1985) (Bistline, J., dissenting).

Sincerely believing that the Court's 1982 opinion displayed a better feel for the facts of this case than today's majority opinion, and continuing to cleave to it, once again I submit it as a sound and thorough disposition of the appeal—one that should have terminated the case long, long ago.

BISTLINE, Justice [as of September 30, 1982], concurring in the reversal; dissenting as to directions on remand.

This is an appeal by plaintiffs-appellants, H. Reynold George and his brother, Dennis

L. George, from a judgment in favor of defendants-respondents and cross-appellants, Tanners, quieting title to a business property in the Tanners. The Tanners cross-appeal from that portion of the judgment which awarded a money judgment in favor of the Georges on the basis of unjust enrichment.

The Georges owned a theatre in Rigby, Idaho, and the Tanners owned an adjoining business property consisting of a cafe and apartments. In 1970 the Georges sold the theatre property to the Tanners on an installment contract with a purchase price of $50,000. In August, 1976, the Tanners sold the cafe, apartment, both real and personal property, on an installment contract to Food Management Services and its president, Webb D. Evans. Contemporaneously, it was agreed between the Georges and the Tanners that the Georges would mark the theater contract paid in full, giving title thereto to the Tanners, and accept an assignment of the Evans contract, other than the $20,000 down payment, in consideration therefore. Specifically, the consideration which the Tanners gave and the Georges accepted was an interest in a contract receivable.[1]

Evans and Food Management Services made four monthly payments and then, in January 1977, defaulted on the cafe contract. At that time major repairs and replacements were needed, and the major liabilities of the cafe totaled approximately $105,000. The cafe property appeared to have no value in excess of the underlying mortgages.

Thereafter, Nyle Tanner and Reynold George met several times to discuss means of settling their interests in the cafe property. Immediately after the default, Tanner considered abandoning the cafe and allowing the bank to foreclose on the mortgages. Reynold George counseled against that action, arguing that because the Tanners were and remained personally liable

on the mortgages, they could be additionally liable for a deficiency judgment. Tanner later offered to sell his remaining interests to the Georges, first for $20,000, and then for lesser sums. At one time he offered to relinquish his entire interests in the cafe to the Georges if the Georges would assume the liabilities of the cafe property. Reynold George rejected each of Tanner's offers, consistently disclaiming any interest in the cafe property, stating that he wanted nothing to do with the cafe property, and repeatedly indicating that he and his brother would pursue their remedies against Evans and Food Management Services. Reynold George, at one time, offered to give the Tanners the George interests in the cafe if the Tanners would resume payments on the previously cancelled theatre contract. The Tanners rejected that offer.

During all that period of time the Tanners assumed the responsibility and expense of operating the cafe. The Tanners found a lessee to operate the cafe, but the income from that lease did not cover expenses during the months immediately following the default. The Tanners absorbed those losses, plus the costs of repairs and replacements. No funds were provided by the Georges to assist the Tanners in meeting those costs, although the Georges knew at the time of the default that the cafe was losing money, that it would continue to do so for some time, and that the underlying mortgage payments were continuing in nature. In September 1977, the cafe's monthly cash flow began to be consistently positive.

The Georges ascertained that Food Management Services had filed a petition of bankruptcy and that Evans, as an individual, did not possess assets sufficient to enable him to respond to a judgment on the installment sales contract. In February 1978, the Georges filed the instant action seeking to have title to the cafe quieted in themselves on the basis that the cafe was security for the assignment of the Evans

---

1. Although probably of little difference in the outcome, the single document which evidenced this transaction (which document was drawn by the Georges) did not spell out that the $20,000 receivable not being assigned by the Tanners was the $20,000 down payment—although it is reasonably clear from the conduct of the parties that such was the case.

and Food Management Services' contract. Following trial of the matter, the district court found that the Georges, upon default, had the right to look to the cafe as security, but it held that they were barred from asserting that right by the Tanners' equitable defenses of laches and estoppel. Thereupon, the court quieted title to the cafe in the Tanners, but invoked the doctrine of unjust enrichment to make a compensatory award of $28,500 to the Georges. Both parties appeal.

The Georges contend that the district court erred when it held that the equitable defenses of laches and estoppel barred their claim to the cafe property. We agree.

### I.

A point which the parties apparently did not fully consider or urge upon the trial court was the relationship created by the assignment executed by the Tanners in favor of the Georges. This is, however, of paramount importance in resolving the problem which the parties visited upon the trial court, and it at once becomes apparent that a determination of that relationship also determines the solution.

When the Tanners sold to Evans (Food Management Services) on a title-retaining contract, this established between them the relationship of vendors-purchaser. Evans on completion of the contract would have been entitled to a deed to the real property and a bill of sale to the personalty which was involved in the transaction. The Tanners retained those titles to the realty and personalty as security, and the contract set forth their remedies if Evans defaulted.

A contract receivable, whether of realty or of personalty, may be owned by one or more persons as tenants in common. 20 Am.Jur.2d, Contenancy and Joint Ownership § 25 (2nd ed. 1965). A tenancy in common is exactly what was created here when the Tanners sold a proportionate interest in a contract balance, the contract being secured by the realty and personalty being sold.[2] Accepting that the bank had a prior claim in the amount of $100,000 on all of the security, and that, for round figures, the net receivable on the $170,000 Evans contract was $70,000, the Tanners retained a two-sevenths interest ($20,000), and the Georges acquired a five-sevenths interest ($50,000). These amounts represented their respective proportionate shares in the cotenancy, and also their respective shares in the real estate and personalty which secured the indebtedness due each. That cotenancy, once created, could not be divested—although either party was free to transfer to a third party, who would in turn become a cotenant—which did not happen here. What did happen was that Evans made payment for four months, and then defaulted. The Evans contract receivable turned out to be valueless insofar as collecting the payments was concerned, and on Evans' default the only practical remedy left to the Tanners and the Georges was to retake possession of the security, which the Tanners did. When the Tanners retook possession of the property (which repossession was specifically provided for by the Evans contract), the Tanners were at that time only two-sevenths owners, based on the values and figures assessed when the Georges bought in.

It is clear, however, that the Tanners, although perhaps not knowledgeable in legal terminology and without knowing that they did so, recognized that the Georges also had an interest in the contract and in the repossessed property, and accordingly

---

**2.** It is beyond question that the Georges obtained an interest in the real property when they bought in to the Evans contract. The assignment contract specifically states that "H. Reynold George and Dennis L. George are to receive all the benefits *and rights* that would otherwise accrue to the undersigned Tanners under the terms of said [Evans] contract." (Emphasis added.) One of the Tanners rights under the Evans contract was, upon default and reasonable notice, to take "possession of the premises, fixtures and equipment...." The trial court specifically held that "at the time of the Evans default, plaintiffs had the right to look to the property as security. During the trial, defendants did not really contest that issue—relying principally upon their equitable defenses...." Neither party challenges that holding in this Court.

it is equally clear that the Tanners considered that the Georges should, because of their acknowledged interest, share with the Tanners the burden of protecting the common property from falling to a bank which, as the Georges were quick to point out to the Tanners, might obtain a deficiency judgment against the Tanners.

Notwithstanding that the Georges stood to lose the most, their $50,000 receivable as against the Tanners' $20,000, the Georges steadfastly refused to participate in making the bank payments, or in making the necessary expenditures to place the property back on the market. The Tanners, who were perhaps willing to lose $20,000, but were definitely unwilling to face a deficiency judgment, spent considerable money and effort, and salvaged the property to the extent that it became attractive enough to excite the attention of the Georges, who then wanted and demanded it. The Tanners' appellate brief rather pungently states their view of the Georges' early inaction, and later desire to participate:

"The facts of this case are a modern version of the story of 'The Little Red Hen:' no one wanted to help her with the work and risk of planting the grain, watching over it till it took root, harvesting, milling, making the bread and then baking it. However, once the work and risk was over and the aroma of the fresh-baked bread filled the air the Little Red Hen found herself surrounded by those who had previously refused to help but who were now anxious to help her eat the fruits of her labors.

"The same is true here. The Georges accepted the substantial prospective benefits in the assignment of the restaurant contract in consideration for the risks. When default—the previously anticipated risk—occurred and circumstances compelled action and money was needed to preserve the restaurant or lose it forever as a security, plaintiffs did nothing. The entire burden and risk of staving off foreclosure by First Security Bank, meeting monthly obligations, paying taxes and insurance, replacing the roof, and making other substantial expensive repairs was left on the Tanners' shoulders by the Georges. The Tanners carried that burden alone. The Georges should not now be heard to complain that the Tanners owe them something from the property they 'affirmatively made it known that they wanted nothing to do with.' "

At another place in their brief the Tanners rather cogently set forth what the law suit was all about:

"The Georges asserted in the complaint and at trial that they possessed all rights, title, and interest in the Royal Restaurant as their security for payment of $50,000 on the restaurant contract and that the Tanners had no security whatsoever. R.1:16–19; 2:1–7. At trial the Tanners asserted that they had maintained sufficient interest in the cafe to secure that portion (approximately $20,000) of the restaurant contract they had not assigned to the Georges and to secure themselves for payment of the underlying loans. Tr.124:16–25; Tr.125:1–5. Although both parties claimed priority over the other's security interest, *the court* by its ruling effectively *held that both parties had security in the restaurant and both had equal priority.* Thus, before adjustments, the parties would be entitled to a prorata share in the equity of the restaurant over and above the underlying loans and assessments." (Emphasis added).

The trial court's ruling mentioned in the foregoing quoted passage was entirely correct. The parties were indeed, as the trial court held, owners of the Evans contract, the Georges' interest therein being five-sevenths, and the Tanners' being the other two-sevenths which they had retained.[3]

---

3. This assumes that the total equity was correctly set at $70,000, with prior obligations of approximately $100,000, which the Georges in their brief say is an incorrect figure. If not entirely correct, the trial court on remand may make necessary adjustments to reflect the exact percentages of ownership.

## II

Unfortunately, neither party appears to have urged upon the trial court the exact legal relationship which the parties had entered into, and the trial court, having correctly held that they were proportionate owners of the vendor's interest in the contract (and its rights and remedies accorded therein to the vendors), was nevertheless persuaded to decide the case on theories of estoppel and laches. Other than by adverse possession or foreclosure, however, there are no Idaho principles of jurisprudence whereunder an owner of real property can be divested of his ownership. And, where a property is owned in cotenancy, the proposition that one of two co-owners may be divested of his ownership, in favor of the other, not by adverse possession, but simply because he declines to cooperate with his cotenant, has no support whatever. The Tanners and Georges were proportionate tenants-in-common. Had they recognized this fact, and had they not insisted on claiming the entire ownership, each for himself, and instead furnished the trial court with propositions of law dealing with cotenancy, they might not both be in this Court, each complaining of the remedy fashioned by the trial court.

While it is understandable that the trial court would conclude, as it did, that it was inequitable for the Georges to neither participate in nor contribute to the preservation of an equity valued at around $70,000, especially where the Georges owned the major share of equity, the law of cotenancy does not allow cotenants to lose their interest in property by reason of their unwillingness or inability to assist in protecting the commonly owned interest.

In *Tremayne v. Taylor*, 101 Idaho 792, 621 P.2d 408 (1980), this Court had before it the contention that two sisters had lost their cotenancy ownership to their two brothers by application of the statutory provisions relating to adverse possession. The sisters had been out of possession since 1962, and the brothers had been in possession, making certain improvements and paying all the taxes. Citing several Idaho cases, including *Hawe v. Hawe*, 89 Idaho 367, 406 P.2d 106 (1965), we sustained the trial court's finding that the brothers had never "brought home" to the sisters the alleged fact that their possession was adverse ("hostile"). As to an alternative theory advanced by the brothers, that of laches, this Court, citing *Finucane v. Hayden*, 86 Idaho 199, 384 P.2d 236 (1963) and that case's recitation of the elements of laches, pointed out that the sisters had no obligation to institute remedial legal action where they were not put on notice that the brothers were acting adversely to the sisters' ownership of the property.

Even closer to the legal propositions here involved is the *Hawe* case which was cited in *Tremayne*, and the California case of *Dimmick v. Dimmick*, 5 Cal.2d 417, 24 Cal.Rptr. 856, 374 P.2d 824 (1962), which the court in *Hawe* quoted and relied upon heavily. The facts in *Dimmick*, recited in *Hawe*, show a remarkable resemblance to the situation which existed between the Georges and the Tanners when Evans defaulted and the real and personal property being sold reverted back to their possession:

> "In 1937 defendant told plaintiff that: '* * * he was not going to put any more money or effort into the venture; and that if plaintiff wished to carry on, he could do so with defendant's full permission, but he (defendant) was finished with it. Plaintiff understood that there was a total abandonment of the property by defendant and told him that it was "O.K.," he was out, and that he himself would carry on alone.' 24 Cal.Rptr. at p. 857, 374 P.2d at p. 835.

In that case the plaintiff financed all operations on the ranch and paid all taxes. In addition, plaintiff made improvements upon the land of more than $10,-000. Evidently the defendant did nothing in connection with the land, with the exception of keeping some empty beehives on part of the land without objection by plaintiff. Then in 1959 a buyer

offered $80,000 for the farm and defendant asked for half. In a claim for adverse possession, defendant prevailed, there being no ouster of defendant's interest." 89 Idaho at 378–79, 406 P.2d at 112.

The California Supreme Court denied the claim based on adverse possession, saying much that has long been the law in Idaho, which law was reaffirmed in *Tremayne:*

> "As plaintiff and defendant were co-tenants holding the land in joint ownership, the principle stated in *Johns v. Scobie,* 12 Cal.2d 618, 623 [5], 86 P.2d 820, 822, 121 A.L.R. 1404, is applicable: 'It is a fundamental rule that each tenant in common has a right to occupy the whole of the property. The possession of one is deemed the possession of all; each may assume that another in exclusive possession is possessing for all and not adversely to the others; and consequently one tenant in common does not, merely by exclusive possession, gain title by adverse possession against the others. Such possession will be presumed to be by permission and rightful, unless notice is brought home to the others that it has become hostile.'" *Dimmick, supra,* 24 Cal.Rptr. at 858, 374 P.2d at 826.

It is recognized, of course, that adverse possession is not an issue in the case at hand. Nevertheless the cases mentioned are important in that they serve to drive home the peculiar nature of the rights and obligations which are part and parcel of that legal relationship known as cotenancy. And, while adverse possession is not relied upon in this case (obviously because of the time element) adverse possession, *i.e.,* the means by which one person may lose his ownership to another, is essentially based upon considerations of abandonment, laches, and estoppel—but requires the passage of time, in Idaho five years, and in other states as much as 20 years.

The proposition dealt with in *Hawe* and of importance to the instant case is that of *abandonment* of ownership of real property. The Court recognized and cited a string of Idaho cases indicating that a mere "*possessory* interest" in real property can be abandoned by "a declaration of clear intention to quit and a relinquishment of the rights of possession." 89 Idaho at 379, 406 P.2d at 113. The Court went on to add that the cases so indicating had mostly "arisen over mining interests or water rights." *Id.* The Court then noted that "[t]here are cases which hold that real property (ownership) cannot be abandoned but becomes subject to adverse possession (loss of title)." *Id.* The Court quite apparently approved of and adopted this view, citing cases so holding from Kansas, Oklahoma, and Tennessee, and quoting from the language of an early Tennessee opinion which dealt with the exact proposition:

> "In *East Tennessee Iron & Coal Co. v. Wiggin,* 68 F. 446, 449 (1895), the court said:
>
>> 'Precisely what is meant by "an abandoned" legal title is hard to define. If it is the valid legal title, it is inconceivable how it can be abandoned. * * * Plaintiffs did not abandon their title by neglecting for 40 years to take possession or bring action. *If there has not been a devolution of title by operation of an adverse possession, their title is perfect, and their right of recovery would not be affected by a theoretical abandonment predicated alone upon a neglect of their estate.*' " 89 Idaho at 379–80, 406 P.2d at 113 (emphasis added).

The opinion in *Hawe* was handed down in 1965. Not then available to the Idaho court, but a decision which certainly supports the *Hawe* holding, is *Hunter v. Schultz,* 240 Cal.App.2d 24, 49 Cal.Rptr. 315 (1966). The trial court in that case found against a contention of loss by abandonment, laches, and adverse possession of a cotenant's ownership of a share of real property:

> "Notwithstanding the court's findings and conclusions on the issues of abandonment and adverse possession, counsel for Hildegard advised us at oral argument that appellant's contentions on appeal were not directed to these points. *In-*

deed no tenable arguments could be advanced on such bases. The rule is long and well settled that a title in fee cannot be divested by abandonment. (Ferris v. Coover (1858) 10 Cal. 589, 631; Davenport v. Turpin (1872) 43 Cal. 597, 602; Northern Assurance Co. v. Stout (1911) 16 Cal.App. 548, 557, 117 P. 617; Kern County Land Co. v. Nighbert (1925) 75 Cal.App. 103, 106 [241 P. 915]; Carden v. Carden (1959) 167 Cal.App.2d 202, 209, 334 P.2d 87; 1 Cal.Jur.2d, Abandonment, p. 9; 1 Am.Jur.2d, p. 14; 1 C.J.S. Abandonment § 5, pp. 13–14; 4 Tiffany, Real Property (3rd ed.), p. 28.)" 49 Cal.Rptr. at 317–18 (emphasis added) (footnotes omitted).

In Ferris v. Coover, supra, the California Supreme Court had no trouble whatever with holding that the doctrine of abandonment was not applicable to the ownership of real property:

"The doctrine of abandonment only applies where there has been a mere naked possession without title. The right of the occupant originating in mere possession, may, as a matter of course, be lost by abandonment. Where there is title, to preserve it there need be no continuance of possession, ..." 10 Cal. at 631.

American Jurisprudence Second provides a statement wholly in accord with the early pronouncement by the California Supreme Court:

"The general rule is that the legal doctrine of divestiture of title to property by abandonment is not applicable as to real property where the state has passed a perfect legal title thereto; such a title remains vested until it passes by grant, descent, adverse possession, or some other operation of law such as by escheat or forfeiture. If the title is perfect and complete, the mode by which the particular individual acquired it is not material as regards the matter of abandonment by him. A title acquired by adverse possession cannot be lost or destroyed by mere abandonment of the property, any more than a title acquired by deed, de-

vise, or descent from the true owner." 1 Am.Jur.2d, Abandoned, Lost and Unclaimed Property, § 13 at 14 (footnotes omitted).

In Helms v. Vaughn, 467 S.W.2d 399 (Ark. 1971), abandonment was claimed by reason of a document entitled "RELEASE," which was duly signed by an owner of an interest in a mining lease.

"The appellants contend that the release executed by the appellee is a valid conveyance that divested title from appellee and vested it in appellants, that the release constituted an abandonment of the royalty interest, and that a royalty estate once abandoned should merge with the surface estate and be considered as a single interest.

"The law is well settled in this state that a conveyance of oil or gas in its natural state is a conveyance of an interest in land. (Citations omitted.) Since an oil and gas deed conveys an interest in land, all the formalities of a conveyance of any other interest are required. Osborn v. Arkansas Territorial Oil & Gas Co., [103 Ark. 175, 146 S.W. 122] supra. The release executed by Jack Vaughn and his wife could not operate as a conveyance to anyone since no grantee was named or otherwise identified in the instrument. (Citations omitted.)

. . . .

"Appellants contend that appellee abandoned the property. ...

"We do not agree, however, that the elements necessary for abandonment are present in this case. One cannot divest himself of title to real property by abandonment alone. There must not only be an intent on the owner's part to relinquish his claim, it must be accompanied by circumstances of estoppel and limitation, if the abandonment is not by a legal deed of conveyance. Carmical v. Ark. Lbr. Co., 105 Ark. 663, 152 S.W. 286; Sharpp v. Stodgill, 191 Ark. 500, 86 S.W.2d 934, 87 S.W.2d 577; C.W. Lewis Lumber Co. v. Fletcher, 224 Ark. 464, 274 S.W.2d 472. There was no evidence of any reliance on Vaughn's alleged

abandonment or of any other condition which would create an estoppel or bring limitations into play." 467 S.W.2d at 400–01.

In *Sharpp v. Stodghill*, 191 Ark. 500, 86 S.W.2d 934, 936 (1935), cited in the above passage, the Arkansas Supreme Court cited Thompson on Real Property, vol. 3, p. 565 for the proposition that an abandonment of real property ownership can only take place by "the act of leaving the premises vacant so that they may be appropriated by the next occupant, and the intention of not returning," and held in that case that there had been such an abandonment by the owner. But, of extreme importance is that the court also declared, and I believe correctly, that "the abandonment of real property does not confer title on the next occupant or any other person, but it disentitles the person who has abandoned it to reclaim it." 86 S.W.2d at 936. That court went on to hold that abandonment, to effectively change ownership must be shown "to have been accompanied by circumstances of estoppel and limitations." 86 S.W.2d at 935. Estoppel, of course, has to do with leaving the property vacant so as to give the appearance of having been deserted and abandoned—thus inviting others to move on and make improvements—and limitations, which have to do with one of the necessary elements of any adverse possession which results in creating a new title. In a later case, also cited in the quotation from *Helms v. Vaughn, supra,* the Arkansas court added further enlightenment to its doctrine of allowing abandonment as a means of divesting oneself of title when accompanied by limitations or estoppel, pointing out the legal theory that title to real property must always rest in someone, and that a property owner may not divest himself of ownership through abandonment *alone. Lewis Lumber Co. v. Fletcher*, 224 Ark. 464, 274 S.W.2d 472, 473 (1955).

An earlier, and the controlling Arkansas case, (also cited in the passage quoted earlier) *Carmichael v. Arkansas Lumber Co.,* 105 Ark. 663, 152 S.W. 286 (1912), made it clear "that before the plea of laches can be available to deprive the true owner of his land, it must be shown that the party claiming the same and his grantors have, prior to the commencement of the suit, paid the taxes of the land under color of title for at least seven years, the statutory period of limitation." 152 S.W. at 288. Citing an earlier case, *Osceola Land Co. v. Henderson*, 81 Ark. 432, 100 S.W. 896, 898 (Ark. 1907) the Arkansas court quoted from it this passage:

" 'Mere delay does not, of itself, bar the plaintiff. Laches in legal significance is not mere delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, *it matters little whether one presses a right promptly or slowly within the limits allowed by law;* but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has in good faith so changed that he cannot be restored to his former state if the right be then enforced, delay becomes inequitable and operates as estoppel against the assertion of the right.' " *Id.* (Emphasis added.)

Rather clearly the Arkansas court in application of its doctrine of divestiture of title by abandonment coupled with laches and limitations, has stated very nearly the rule which seems to obtain in this jurisdiction.

Applying the principles of *Hawe* and the California cases, there was no abandonment by the Georges which divested them of their five-sevenths ownership. Were we to apply the Arkansas rule, the result would be the same, because the Arkansas rule requires an abandonment *plus* elements which would support application of estoppel. Even if abandonment had been shown, there is no evidence in the record which would sustain any estoppel against the Georges. It is evident that when Evans defaulted neither the Georges nor the Tanners were disposed to salvage the property, and each wanted to wish it off on the other. It is beyond dispute that the Tanners did take over the property only upon being cautioned by Reynold George that their failure to do so might expose them to

a deficiency judgment on the bank note for which they were personally liable. This may very well have been the best advice the Tanners could have received. They were certainly at liberty to seek other advice, or otherwise act on their own volition. In any event, the giving of that advice cannot be said to work an estoppel against the Georges, even though they remained unwilling to participate or contribute, and even though it might be considered inequitable on their part. It is quite possible that the Tanners, had they not had their names on the bank note, would also have "abandoned" the property as did the Georges—with all parties willing to jump back in should some buyer at a bank foreclosure sale pay more than the amount due the bank. Simply put, the Tanners were not in any position to take that chance; the Georges were.

In view of the law governing involuntary divestitures of title to real property, it was error for the trial court to quiet title to the jointly held property in the Tanners, although as pointed out earlier, the parties apparently did not invite the trial court's attention to a consideration of the legal relationship which the parties entered into when the assignment was executed by the Tanners and accepted by the Georges. The district court judgment is reversed, not only as to the award of all the commonly owned property to the Tanners, but also the award of compensation to the Georges based upon considerations of unjust enrichment.

## III

In view of our reversing the trial court's judgment, we think it proper to provide guidance as to resolution of the issues in this case on remand. Initially, we note that the entry of a decree which declares the proper proportionate ownerships will not unjustly enrich the Tanners at the Georges' expense. It is proper for the court to enter a decree which conditions the ownership share of the Georges on their paying to the Tanners whatever amount is by the trial court determined to be owing

after a proper accounting. The situation here is not unlike that in *Watkins v. Eaton,* 30 Maine 529 (1849), which involved the payment by one cotenant of an encumbrance (back taxes) in order to timely redeem the common property. Similarly, in the case at hand, when Evans defaulted and common property was taken back, it was subject to an encumbrance in favor of the bank, an encumbrance which necessarily had to be paid—or else suffer the loss of the property. The reasoning of the Maine court is both enlightening and persuasive:

"An owner, who pays the amount required to redeem his own share and the share of a co-tenant, cannot be entitled to recover of that co-tenant the amount equitably chargeable to his share without other proof, for he may not have paid by his consent or at his request. Such cotenant may have concluded, that the land was not of such value, that it would be beneficial to him to have it redeemed. He could not be compelled to redeem, but might, if he pleased, abandon his title to the purchaser and refuse to pay to him or to any other person the amount, which would be required to redeem it. If one, who may be obliged to redeem the share of a co-tenant to relieve his own share from incumbrance, could have no right to retain the share of such co-tenant as security and to obtain a reimbursement of the amount equitably chargeable to it, he might utterly fail to obtain compensation; and yet his co-tenant without making any payment might be entitled to the full possession and benefit of his share of the land, discharged from the incumbrance.

"The law cannot be justly chargeable with such results, as produced by conformity to its provisions. *The principle is well established and is of frequent application in the redemption of mortgages, that one having a legal interest in an estate under incumbrance, may redeem the whole estate when necessary, to enable him to redeem his own share or to relieve his own title from incumbrance, even against the pleasure of a co-tenant or other owner, and may*

*be regarded as the assignee of the incumbrance upon the other shares or interests, and may retain possession of them to secure a reimbursement of the amount equitably chargeable to them.* Gibson v. Crehore, 5 Pick. 146; *Jenness v. Robinson,* 10 N.H. 215; *Wilkins v. French,* 20 Maine 111.

"A sale made for the payment of taxes is but an incumbrance upon the estate, so long as the right to redeem exists. The purchaser receives and holds the title as security for money paid; and such a title is in principle a mortgage, although it does not exist in a form to be included by our statute provisions respecting mortgages. By the application of this principle to cases of this kind, complete justice may be done to all interested in the land, and without it such a result would fail to be accomplished." 30 Maine at 534–35. (Emphasis added.)

The Supreme Court of California also dealt with the solution of joint tenancy problems arising out of factual contexts much like the one at hand. In *Calkins v. Steinbach,* 66 Cal. 117, 4 P. 1103 (1884), there were three equal cotenants of property upon which there was a mortgage; the mortgage was foreclosed and the property sold. The plaintiff Calkins, not an owner, purchased the one-third ownership of one of the three original cotenants, and timely redeemed the property from the execution purchaser. Steinbach, the defendant, acquired the other two one-third interests. When Steinbach refused to pay Calkins two-thirds of what Calkins had paid out to redeem, Calkins sued Steinbach and sought "meet and equitable relief." The superior court adjudged Calkins the owner in fee of the entire lands, and barred Steinbach from asserting any further claim thereto. In essence the court quieted title in Calkins much as the trial court in the instant case quieted title in the Tanners.

The California Supreme Court held the judgment was clearly erroneous. The court held against the contention of Calkins that Steinbach, as successor to the other two one-third ownerships, had to redeem

those interests from him, and against Calkins' theory that he could have a money judgment. The holding of the case declared the respective rights of cotenants where one of them redeems the commonly owned property:

"Upon [Calkins'] redemption the effect of the sale was terminated, and he thereupon acquired an equitable lien upon the interests of his co-tenants in the lands for their just proportion of the money paid by him in effecting the redemption; and he had his action to recover such proportion, and a decree to the effect that in default of such payment the interests of the co-tenants in the lands be foreclosed. Those were the relative rights and duties of the respective parties." 4 P. at 1105.

The court said further, touching upon Steinbach's refusal to contribute his proportion:

"The conduct of the defendant, Steinbach, as evidenced by his answer, does not commend itself to a court of equity, but it has not worked a forfeiture of any of his interest in the lands in question. He is bound to the plaintiff for such proportion of the redemption money, with interest, as his interest in the lands bears to the whole thereof; and, as security for payment of such sum, plaintiff holds an equitable lien upon all of the interest of Steinbach in the property. To enforce the relative rights and obligations of the respective parties, it is necessary that this amount be judicially ascertained, a day fixed within which it be paid, and a decree to the effect that in default of such payment defendant be forever foreclosed of all right or interest in the lands." 4 P. at 1106.

*Calkins v. Steinbach* was in turn relied upon by the Washington Supreme Court in *Anderson v. Snowden,* 44 Wash. 274, 87 P. 356 (Wash.1906), a case which also bears much similarity to the one at hand in that therein, as here, the parties mistook the nature of their relationship and sought relief to which neither was entitled. Anderson and Snowden put in together to buy a

$4,800 parcel of real property, initially paying less than $250 and meeting the required payments by encumbrancing the property or portions thereof to three different individuals from whom they borrowed. They also signed two notes to the bank. Anderson ended up paying the various joint indebtednesses, three of which were secured by the property, and in the process demanded of Snowden that he contribute or be forfeited out. Snowden either couldn't or didn't, and the escrowed deeds which the two had jointly contracted for in the first place had been put in Anderson's name. Anderson thereafter declared Snowden out and refused to recognize that he had any interest. Anderson brought suit to quiet title in himself. Snowden cross-complained, asking that title to a one-half interest in the property be quieted in him, subject to payment of his portion of the purchase price—*which he did not tender.*

The Supreme Court held that they were joint purchasers or tenants in common, and that this relationship would determine their rights and obligations. "Their common property was held under deeds [given as security instruments] to secure a common indebtedness. Each tenant in common was a surety for the other. The only remedy of either was to pay the common indebtedness, and be subrogated to the rights of the creditors against the common property. The remedy of the plaintiffs was by contribution, and not by forfeiture." 87 P. at 358. After quoting *Calkins v. Steinbach,* the Washington court added:

"But, while neither party was entitled to the relief demanded, nevertheless, the court had jurisdiction of the parties and the subject-matter of the action, and should have granted to the parties such relief as they were entitled to under the facts.

"The judgment is therefore reversed, and the cause remanded to the court below, with directions to ascertain the amount the defendants should pay to make up their one-half of the purchase price, and any other sums the plaintiffs may have paid on account of the common property, with interest from date of payment, and to enter a decree declaring the defendants the owners of an undivided one-half interest in the premises in controversy upon the payment of the sums thus ascertained within 10 days from the date of the decree; and, if they fail to make payments within that time, to enter a decree quieting the plaintiffs' title, as prayed in their complaint." *Anderson v. Snowden,* 87 P. at 358.

It is thus seen that the Washington court believed that on reversal and remand the trial court should proceed to accord the relief to which the parties were properly entitled, but had not prayed for. In *Dimmick v. Dimmick,* 58 Cal.2d 417, 24 Cal. Rptr. 856, 374 P.2d 824 (1962), discussed earlier, it is seen that the California Supreme Court took the decided view that it would find no error on the part of the trial court in not ordering contribution for the non-participating co-owners' just share of moneys advanced over 22 years by the other owner "for payment of taxes, encumbrances and improvements," no request for such relief having been made at the trial court. 24 Cal.Rptr. at 859, 374 P.2d at 827.

In the case at hand there is an additional element to be considered in that the Tanners, though personally liable for the encumbrance against the common property, have not paid it. Absent the Georges' offer to proportionately assume any contingent personal liability to the bank for the note as to which the encumbrance is security, it *may* very well be that the Georges are not equitably positioned to ask for a decree declaring their proportionate interest in the common property until that encumbrance has been retired. Equally so, the Tanners are perhaps in no position to request contribution for an encumbrance which has not been paid off—thus making the factual situation unlike that in *Anderson v. Snowden, supra,* where Anderson had retired all encumbrances against the common property.

At this point in time, however, we simply hold that the judgment appealed from must be held erroneous in depriving the Georges

of their proportionate ownership in the common property. Any equitable considerations in an accounting or remand will be for the trial court to wrestle with on remand, taking into account the views set forth in this opinion. Perhaps the parties from this point on will be able to resolve the controversy without further court intervention. They should find helpful a comprehensive annotation in 51 A.L.R.2d 388 (1957), relied on heavily by the California court in the *Hunter v. Schultz* case, 240 Cal.App.2d 24, 49 Cal.Rptr. 315 (1966).