**CROSSLAND INVESTMENT CO., INC., Plaintiff,**

v.

**F.J. RHODES; North Monroe Capital, Inc.; and Barrie B. Rhodes, individually and as trustee, Defendants.**

**No. 4:00CV456–RH.**

United States District Court, N.D. Florida, Tallahassee Division.

Feb. 28, 2003.

1303

Carl R. Pennington, Jr., Esq, Pennington, Culpepper, Moore, etc., Tallahassee, FL, for plaintiff.

Martin Stephen Turner, Esq, Broad & Cassel, Tallahassee, FL, for defendants.

### ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

HINKLE, District Judge.

By this action a real estate broker seeks to recover amounts it would have received as compensation if certain renewal options under a long-term lease had been exercised. The options were not exercised, but the broker says that was the fault of the lessor and those acting in concert with her, who, the broker says, failed to act in good faith, thus defeating the broker's justifiable expectation that the options would be exercised.

Each side has moved for summary judgment. I conclude that the lessor acted in her own self-interest, in full compliance with the governing agreements and Florida law, as she was entitled to do, and that the broker had no right to expect either that the options would be exercised or that the amounts now at issue would be paid. I grant defendants' motion for summary judgment.[1]

---

1. Because I grant defendants' motion, I view the record in the light most favorable to plaintiff, as the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The critical facts are undisputed.

## Background

### The Three–Sided Arrangement

As of September 1, 1980, a three-sided arrangement was entered for development of approximately 18 acres near downtown Tallahassee, Florida. The participants were Eulalia Boone (the predecessor in interest to defendant Barrie B. Rhodes, individually and as trustee), who owned the property; plaintiff Crossland Investment Co., Inc., whose principal, Albert Lewis Buford, Jr., was a commercial realtor; and Scotty's, Inc., the well known retail chain. Under the arrangement, Scotty's was to occupy approximately four acres, and other tenants were to be solicited for the remaining 14 acres. The arrangement eventually was structured through three separate contracts: a "Lease" of the entire 18 acres from Ms. Boone to Scotty's; a "Consulting and Listing Agreement" between Scotty's and Crossland under which Crossland was to assist in the development and subleasing of the 14 acres;[2] and an "Escrow Agreement" under which Crossland was to collect sublease payments and distribute them to Scotty's, Crossland and Ms. Boone, in agreed amounts.

The Lease from Ms. Boone to Scotty's was for a term of just over 26 years, expiring December 31, 2006. In addition, the Lease afforded Scotty's four renewal options of five years each, so that, if Scotty's exercised all the options, the Lease would remain in place for a total of 46 years, through December 31, 2026.

Under the Lease, all taxes, insurance and other expenses, and all costs of developing the entire 18 acres, were to be borne by Scotty's. The entire arrangement thus was cost-free to Ms. Boone. After an initial delay while the property was developed, Scotty's was to pay Ms. Boone $60,000 per year.[3] Ms. Boone also was to receive one-half of all revenue from the entire 18 acres exceeding that $60,000 per year (in effect, one-half of all rent received from subtenants). The Lease indicated that the other half of revenue exceeding $60,000 per year would be paid to Crossland.[4]

The "Consulting and Listing Agreement" between Scotty's and Crossland appointed Crossland as the exclusive leasing agent and broker for the purpose of subleasing the 14 acres, obligated Crossland actively to pursue the subleasing of that tract, and required Scotty's to pay Crossland precisely the amount referred to in the Lease from Ms. Boone to Scotty's: one-half of the amount by which the in-

---

**2.** Apparently through oversight, the consulting and listing agreement between Crossland and Scotty's was signed only by Crossland, not by Scotty's. All parties agree, however, that this makes no difference; the agreement as signed by Crossland and forwarded to Scotty's for signature accurately set forth the terms to which they in fact agreed.

**3.** Scotty's also was to receive a credit (in effect a rebate) of $22,000 per year, leaving the net base rent at $38,000 per year. The Lease's provisions regarding the credit were less than a model of clarity. Indeed, Scotty's apparently actually received a credit (or rebate) of $38,000, rather than $22,000, for many years, leaving Scotty's net base rent for those years at $22,000, rather than $38,000.

The precise amount and mechanics of Scotty's base rent payments and the credit make no difference for purposes of the case at bar; if (as is possible) this order describes these matters incorrectly, it is of no moment. For convenience, this order refers only to the gross base rent of $60,000, without regard to the credit; the parties have done likewise in their various memoranda.

**4.** For purposes of the $60,000 threshold, Scotty's gross base rent of $60,000 was included in full, without regard to the credit or rebate. *See supra* note 3. Thus Ms. Boone and Crossland split all revenue from the property other than the Scotty's base rent. Ms. Boone kept Scotty's base rent for herself (after making the appropriate rebate to Scotty's).

come from the entire 18 acres exceeded $60,000 per year. This amount was to be paid monthly, for "each month during which the above-described lease is in effect." Consulting and Listing Agreement at 2 ¶ 3. The "above-described lease" was the Lease from Ms. Boone to Scotty's.

The Escrow Agreement required Crossland to collect all rental payments and to disburse them in accordance with the other documents (the Lease between Ms. Boone and Scotty's and the Consulting and Listing Agreement between Scotty's and Crossland). Thus for each year, Crossland was to disburse to itself and to Ms. Boone one-half each of the amount by which total income from the entire 18 acres exceeded $60,000. Crossland was to receive a nominal fee for its escrow services.

Notably absent from these documents was any obligation running from Ms. Boone to Crossland. To the contrary, the Lease specifically provided that only Scotty's, not Ms. Boone, was obligated to pay Crossland the agreed amounts, and that Ms. Boone herself had no obligation to Crossland.[5]

The arrangement was implemented exactly as intended. A Scotty's store was built and opened on the four-acre parcel. Through Crossland's efforts, the 14 acres were successfully developed and subleased to some 10 or 11 subtenants. (F. Rhodes deposition at 17.) Crossland and Ms. Boone's successor in interest (her daughter, defendant Barrie B. Rhodes, individually and as trustee for her two sons) split the substantial rents paid by the subtenants. For its part, Scotty's occupied the four acres for net rent that came to be

significantly below (indeed, no more than half) the market rate. All was well.

*Replacing Scotty's with Staples*

But alas, business is not static. In the late 1990s, Scotty's closed this store. In 1999, for reasons unrelated to this case, Scotty's struck a deal with Staples the Office Superstore East, Inc. ("Staples"), an affiliate of the well known national retailer, under which Staples would take over some 20 Scotty's sites, through purchase or lease or sublease of the various properties. One of the 20 sites was the one at issue in the case at bar.

Scotty's asked Ms. Rhodes (through her attorney husband, defendant F.J. Rhodes) to consent to a sublease from Scotty's to Staples. Under the original Lease, the lessor's approval of any such sublease was required and was not to be unreasonably withheld.

The original Lease said the four acres would be used only for a Scotty's store. Any sublease to Staples would require modification of that provision. Staples requested, however, a modification allowing the property to be used not just for a Staples store, but also for any other legal purpose. (Kennon deposition Pl.Ex. 1.) Staples also requested other modifications of the original Lease, including, apparently, a change that would allow Staples to continue to hold the property after expiration of the original Lease term. (*Id.*) Ms. Rhodes (still acting through Mr. Rhodes) was willing to consent to a modification allowing the site to be used for a Staples store. (Kennon deposition Def. Ex. 1.) Ms. Rhodes also was willing to consent to some (but not all) of the other proposed modifi-

---

**5.** The Lease said: "Lessor shall not be responsible for any real estate or development commission.... Lessee and Crossland will have a separate agreement to cover their relationship basically providing the details thereof and providing that Crossland's compensa- tion" shall be one-half of rentals on the entire 18 acres exceeding $60,000 per year. (Lease at 6 § IV.) The Lease reiterated: "Lessor shall have no obligation to Crossland hereunder ...." (*Id.*)

cations. The proposed modifications were not a deal breaker. (*Id.; see also* F. Rhodes deposition at 34, 49.)

There was, however, a substantial unresolved issue. Under the proposed sublease, as one would expect, Staples would pay substantially more rent than Scotty's had been paying. Under the deal Scotty's had struck with Staples, Staples would pay $120,000 per year for the first five years of the sublease, and more thereafter. (Kennon deposition Pl.Ex. 3.) Scotty's proposed to keep this increase for itself. Thus, during the first five years, Scotty's proposed to keep $60,000 per year, calculated as the difference between Staples' rent of $120,000 per year and the preexisting Scotty's rent of $60,000. Ms. Rhodes disagreed, asserting that under the parties' original Lease, Ms. Rhodes and Crossland were to split all income from the entire 18 acres exceeding $60,000 per year (including any such income received from Staples or any other subtenant), with Scotty's receiving none of this excess. This was a $60,000 per year disagreement for the first five years, and more thereafter, continuing for the life of the arrangement.

Ms. Rhodes' position on this was far from frivolous. The original Lease said that the "Lessor shall receive one-half (1/2) of all *rental, lease payments*, overages, fees, charges *and income of any descrip-* *tion* received from *both* Tracts [that is, the four acres and the 14 acres] after said rental reaches $60,000 annually." (Lease at 5) (emphasis added). Payments to be received from Staples constituted, at least literally, "rental, lease payments [or] income of any description" from the property. Scotty's was free to argue that this was not what the Lease actually meant, but it was by no means certain that any such argument ultimately would have prevailed.[6]

When this disagreement arose, it was suggested *by Scotty's* that an alternative way of dealing with the situation would be for Ms. Rhodes to buy out the interest of Scotty's under the Lease, and then for Ms. Rhodes to lease the four acres directly to Staples. (F. Rhodes deposition at 33; Mallett deposition at 11, 21; Kennon deposition at 18.) This approach offered substantial advantages to both Scotty's and Ms. Rhodes.

For Scotty's, the advantage was that its obligations with respect to both the four acres and the 14 acres ended, and it received a cash payment as compensation for its favorable (below-market) leasehold. (*See* Mallett deposition at 11–12.) This was consistent with Scotty's overriding goal with respect to all 20 stores involved in the Staples deal: Scotty's wanted to get out from under its lease obligations and to

---

**6.** The language quoted in the text was not the only reference in the papers to the right of Ms. Rhodes and Crossland to receive all rent and income in excess of $60,000 per year from the entire tract, including both the four– and 14–acre parcels. These many references were consistent with Ms. Rhodes' position that any increase paid by Staples should go into the pot that was to be divided between Ms. Rhodes and Crossland. If, on the other hand, the pot to be divided between Ms. Rhodes and Crossland properly was not to include any such excess paid by a subtenant of the four acres (such as Staples), then, in reality, that pot was to include precisely the amount of rent paid on subleases of the 14 acres, no more and no less. On that view, there would have been no need for the provision on payment to Ms. Rhodes and Crossland to refer to any $60,000 threshold or to rent on the four acres; the papers could have said simply that Ms. Rhodes and Crossland each would receive one-half of all rent on the 14 acres. In order to prevail on its position, Scotty's would have had to explain why the documents repeatedly used the far more cumbersome (and in Scotty's view inaccurate) reference to the amount by which rent on the entire 18 acres exceeded $60,000 per year, rather than a simpler (and on Scotty's view more accurate) reference to all rent on the 14 acres.

receive compensation for its interests. (Mallett deposition at 25; Kennon deposition at 25.) And by selling out its interest, Scotty's also could avoid litigation over who was entitled to the rent paid by Staples. In short, Scotty's could receive any agreed sales price for its leasehold interest and also could walk away clean from a site where it had closed its store, where it was paying rent and receiving nothing in return, and where it had obligations with respect to 14 additional acres it did not even occupy.

For Ms. Rhodes, the advantages of a purchase of Scotty's interest were that (1) litigation over the Staples rents would be avoided, (2) the Scotty's Lease would terminate at the end of the original 26–year term, in 2006, thus giving Ms. Rhodes control of the 14 acres at that time, and (3) because the Lease would terminate in 2006, the obligation to split all rent in excess of $60,000 with Crossland also would end at that time.

Scotty's initially demanded $750,000 for its leasehold. Ms. Rhodes rejected the demand, and the parties proceeded toward consummation of a sublease from Scotty's to Staples. Eventually, however, early in 2000, Scotty's dropped the demand to $250,000, and Ms. Rhodes accepted.

The purchase of Scotty's interest was consummated not in Ms. Rhodes' name (individually and as trustee for her sons), but in the name of a corporation formed for this purpose, defendant North Monroe Capital, Inc. The shareholders of North Monroe Capital were Mr. Rhodes (the husband and attorney for Ms. Rhodes who had negotiated the deal) and the Rhodeses' two sons (the beneficiaries of the trust for whom Ms. Rhodes served as trustee). The purchase was made in the name of North Monroe Capital, rather than in the name of Ms. Rhodes (individually and as trustee), both for tax reasons and in order to avoid any claim that Ms. Rhodes' fee inter-

est had merged with the leasehold interest acquired from Scotty's, thus terminating the Lease. (F. Rhodes deposition at 44.)

Simultaneously with the sale of Scotty's leasehold interest to North Monroe Capital, a sublease of the four-acre parcel was entered from North Monroe Capital to Staples, for the remainder of the term of the original lease, that is, through December 31, 2006. Under the sublease, Staples pays rent of $120,000 per year. Ms. Rhodes, individually and as trustee for her two sons, entered a new direct lease to Staples covering the four acres for the period commencing January 1, 2007. (Kusel deposition Ex. 1.)

No effort has been made to end the payments to Crossland during the term of the original Lease. Crossland continues to collect payments in accordance with the escrow agreement and continues to disburse the excess over $60,000 per year one-half each to Ms. Rhodes and Crossland. Indeed, as a result of the Staples transaction, Crossland's take has gone up; the additional $60,000 per year paid by Staples, over and above the amount previously paid by Scotty's, is collected by Crossland as escrow agent and paid one-half to Ms. Rhodes and one-half to Crossland. Crossland thus receives $30,000 more per year than it would have received had Scotty's continued to occupy the property.

Ms. Rhodes, Mr. Rhodes and North Monroe Capital have made clear, however, that the options to extend the original Lease will not be exercised, and that the original Lease thus will terminate on December 31, 2006. Crossland will receive no payments thereafter.

*The Lawsuit*

Crossland filed this action against Ms. Rhodes, individually and as trustee for her sons, and against Mr. Rhodes and North Monroe Capital. Crossland asserts that

the expectation from the outset was that the renewal options would be exercised and that Crossland would be paid through 2046 one-half of the rental income on the entire 18 acres in excess of $60,000 per year. Crossland asserts that, in structuring a transaction designed to end those payments, Ms. Rhodes acted in bad faith. Crossland alleges three causes of action: against Ms. Rhodes for breach of contract; against Mr. Rhodes and North Monroe Capital for tortious interference with a contract or expectancy; and against Ms. Rhodes for unjust enrichment. The parties have filed cross-motions for summary judgment.

## Merits

### The Core Dispute

The parties join issue with some vigor on the technical elements of Crossland's three alleged causes of action. Before turning to those causes of action, however, it is useful to begin by noting the essential nature of the dispute. Crossland claims it expected this arrangement to continue through 2046. Crossland claims, more importantly, that this expectation was reasonable and entitled under Florida law to protection against encroachment by or on behalf of Ms. Rhodes. Ms. Rhodes asserts, in contrast, that she had every right to act in her own self-interest, exactly as she did, and thus to buy Scotty's interest and defeat whatever expectation Crossland may have held with respect to exercise of the options. The essential issue is this: did Ms. Rhodes, as the lessor, have the right (either in her own name or through a nominee) to buy out Scotty's, thus causing the options not to be exercised and depriving Crossland of the compensation it would have received if the options had been exercised? Under well settled Florida law, the answer is yes. Ms. Rhodes acted consistently with the parties' agreements and with the law of Florida.

### Florida Law: Commissions on Lease Extensions

As one might expect, this is not the first time a Florida real estate broker has taken a hit when a lease was not extended. It has happened time and again, always with the same result. A broker who contracts to receive a commission upon extension of a lease gets the commission only if the lease is in fact extended; if the lease is terminated or even just modified or renegotiated, the broker is not entitled to the commission. If this seems harsh, the cure is simple: enter a contract requiring payment on different terms, not just upon extension of the lease.

Thus, for example, in *Plumbing Industry Program, Inc. v. Good,* 120 So.2d 639 (Fla. 3d DCA 1960), a lease gave the tenant an option to renew for an additional two-year term. The landlord agreed to pay its broker an additional commission if the tenant exercised the option to renew the lease "on the same and/or additional space." Shortly before the end of the original term, the landlord and tenant entered a new lease for five years covering slightly more space. The new lease added new terms obligating the landlord to make certain alterations and provide certain parking. The broker sued for a commission and won in the trial court. The appellate court reversed, holding as a matter of law that the broker was entitled to no commission in connection with the new lease. The court said:

> The parties entered into a specific written agreement which provided that the broker would be paid only upon the happening of the event prescribed in the agreement, namely, exercising the option to renew. We cannot rewrite the terms of the contract to extend the provision for a commission to include a statement that the broker is entitled to a commission 'for any subsequent lease

arrangement which the lessor and lessee may execute'. The broker failed to protect himself since he provided only for a commission upon the event that the option to renew or extend the lease for a two-year period would be exercised. We cannot permit recovery in the face of a specific agreement, which controls the rights of the parties absolutely. *Hanover Realty Corp. v. Codomo,* Fla.1957, 95 So.2d 420; *Kay v. Sperling,* Fla.1955, 83 So.2d 881; cf. *Dooly v. Embry–Riddle Co.,* 2 Fla.Supp. 172 (1952).

*Plumbing Industry,* 120 So.2d at 641–42.

The same reasoning is fully applicable in the case at bar: Crossland entered a contract under which it would be paid the amounts now at issue if but only if the Lease at issue was extended; the Lease was not extended; under the terms of the contract, Crossland cannot recover the amounts at issue; Crossland failed to protect itself by insisting on more favorable terms; the court cannot rewrite the contract.[7]

Similarly, in *Strano v. Reisinger Real Estate, Inc.,* 534 So.2d 1214 (Fla. 3d DCA 1988), a broker procured a lease and was entitled under his contract to a commission on any "renewal or extention [*sic*]" thereof. At the expiration of the original term, the same landlord and tenant entered a new lease with additional terms: the new lease afforded the landlord a right of cancellation, called for higher rent, and covered more acreage. The broker sued for a commission, and the trial court entered judgment in his favor. The appellate court reversed, holding as a matter of law that the new lease was not a renewal or exten-

sion of the original lease and that the broker thus was not entitled to a commission. The court cited in support of this result the "well established" rule that when competent parties reduce their engagement to writing without any uncertainty, it is conclusively presumed that the "whole engagement and the extent and manner of their understanding is contained in the writing." 534 So.2d at 1215. Again, the same reasoning is fully applicable in the case at bar.

To like effect is *Woodard Tire Co. v. Hartley Realty Inc.,* 596 So.2d 1114 (Fla. 3d DCA 1992). There, a lease of premises used for a tire store gave the tenant an option to renew upon expiration of the original term. Under their agreement, the brokers who procured the lease would be entitled to a further commission if the tenant exercised the option to renew. The tenant was acquired by a larger tire company, to whom the tenant assigned its interest under the lease. At the end of the original term, the landlord and new tenant continued their relationship, even characterizing the transaction as an exercise of the tenant's option to renew the lease. Simultaneously, however, the parties renegotiated the rent. The brokers sued for a commission, and the trial court ruled in their favor. The appellate court reversed, holding as a matter of law that because the rent changed, this was not a renewal of the original lease, no matter what the parties called it, and the brokers thus were entitled to no commission.

In the case at bar, as in *Plumbing Industry, Strano* and *Woodard Tire,* a bro-

---

**7.** Crossland itself prepared the Consulting and Listing Agreement. That agreement gave Crossland the right to specified payments for each month "during which the [Lease at issue] is in effect." As both sides agree, this meant not only during the Lease's 26–year term, but also during any extensions pursuant to the four five-year options. But there is not

a hint in the Consulting and Listing Agreement, or in any of the testimony or other documents, of any right to any payment beyond the 26–year term of the Lease, if the options were *not* exercised. Crossland's right to the payments now at issue thus was contingent upon exercise of the options, exactly as was the case in *Plumbing Industry.*

ker entered a contract giving the broker a right to additional compensation upon renewal or extension of a lease.[8] In the case at bar, as in *Plumbing Industry, Strano* and *Woodard Tire*, a new lease was entered on terms that were at least somewhat different; the original lease did not continue beyond the expiration of its original term. Indeed, in the case at bar the changes between the original and new leases are especially significant; the new lease is to a different tenant altogether, covers only four of the 18 acres involved in the original lease, and is for double the rent. Here, as in *Plumbing Industry, Strano* and *Woodard Tire*, the broker is entitled to no compensation in connection with the new lease. And here, as there, the broker has no right to complain; "he failed to protect himself since he provided only for a commission upon the event that the option to renew or extend the lease ... would be exercised." *Plumbing Industry*, 120 So.2d at 641.[9]

*Crossland as Developer, not Broker*

Crossland asserts, however, that it was not acting as a broker but as a developer, and that its compensation was not a commission but a development fee. This affects the analysis not at all.

First, the factual underpinning of Crossland's assertion is at least questionable; the "Consulting and Listing Agreement" that Crossland itself prepared refers to Crossland as "the Broker."

More fundamentally, even if Crossland had been only a developer or consultant of some sort not involving any brokerage services at all, it would not matter. *Plumbing Industry, Strano* and *Woodard Tire* did not develop new principles of Florida law applicable only to real estate brokers or their commissions. They were, instead, straight forward applications of long standing contract principles. A contract means what it says. If a contract says a party is entitled to a payment at issue only upon renewal or extension of a lease, then the party is entitled to the payment only upon renewal or extension of the lease. Whether the party is a broker or a developer or an undertaker does not matter. And it also does not matter whether the payment is called a commission or a development fee or, as Justice Scalia might say, "Mary Jane." *See Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 2444, 153 L.Ed.2d 556 (2002) (Scalia, J., concurring).

*Exercise of the Option as a "Virtual Certainty"*

Crossland also asserts that it should prevail because exercise of the options was a virtual certainty. This assertion fails for three reasons.

First, exercise of the options was not a virtual certainty, because even if the same landlord and same tenant had determined to continue their relationship, they might well have chosen for many reasons to alter the terms of the lease, rather than simply

---

**8.** In some of the cases, the tenant had an option to extend the lease. In others, there was no such option. But this affected the courts' analysis not at all. As the decisions made clear, under Florida law, renewal and extension mean the same thing. And this is so whether there is or is not an express option to renew or extend the lease. *See, e.g., Strano*, 534 So.2d at 1215 n. 2 (addressing lease not containing option); *Woodard Tire*, 596 So.2d at 1116 & n. 2 (applying same analysis to lease containing option).

**9.** *See also Cushman & Wakefield, Inc. v. Williams*, 551 So.2d 1251 (Fla. 2d DCA 1989) (holding that former employees of a brokerage firm who had a contractual right to a share of any commission received by the firm upon extension of a lease were not entitled to a share of the commission received when the landlord and tenant entered an "amendment" to the lease which extended the duration but also added new terms; this was a new lease, not an extension of the prior lease).

renewing the lease. This happened in *Plumbing Industry* and *Strano* and *Woodard Tire,* and it was not at all unforeseeable in 1981 that by 2006 the same thing could happen here.

Second, it was not even virtually certain that these same parties would continue their relationship on any terms at all. Indeed, they did not. Scotty's business plans changed, and it closed this store, before Ms. Rhodes had any involvement in the issue at all. This is an illustration of what is obvious: projecting real estate and business conditions and events 26 years in advance is uncertain at best. In 1981, it was not unforeseeable that Scotty's could go out of business entirely by 2006, just as bigger, apparently more invincible companies have done. It also was not unforeseeable that this entire real estate development might fail. That the owner, lessee and broker were optimistic did not make success a virtual certainty; many a real estate development has failed, in this city and elsewhere, but never for lack of optimism.

And third, even if exercise of the options had in fact been a virtual certainty, this would not matter. All this would mean is that Crossland's chances of getting further payments after 2006 were virtually certain. It would not mean that, even in the unlikely event the options were not exercised, Crossland would still get paid. If a party has a contractual right to payment if a red ball is picked from a barrel, and if 99,999 of the 100,000 balls in the barrel are red, one might label the party's chance of being paid "virtually certain." But if the ball that is picked is the one ball that is not red, the party is not entitled under its contract to be paid, no matter how unlikely that result might have seemed. Crossland contracted to be paid after 2006 only if the original Lease remained in effect, that is, only if the options were exercised, but they will not be. Whether that result was likely or not likely has nothing to do with it. *Ms. Rhodes as the Cause of the Non-Renewal*

Crossland also asserts that it should prevail because Scotty's did not decide for itself not to exercise the options; instead, Crossland says, Ms. Rhodes (through her husband and attorney, Mr. Rhodes) brought about this result. Again, the assertion does not help Crossland.

First, Crossland is wrong factually, at least in substantial part. Scotty's closed its store for reasons of its own; Ms. Rhodes had nothing to do with it. When Scotty's sought to sublease the property to Staples and Staples sought to modify the lease terms, Ms. Rhodes raised legitimate concerns, but the various modifications sought by Staples would not have blocked consummation of the deal. It was Scotty's that suggested a buyout, in part because Ms. Rhodes asserted (as she had every right to do) that the increased rent paid by Staples would be payable to Ms. Rhodes and Crossland, in accordance with the terms of the original Lease, not to Scotty's. Thus this was not a contrived arrangement concocted by Ms. Rhodes; it was, instead, a situation brought about by Scotty's decision to close the store and attempt to sublease it to Staples, and the fallout from that decision. And Ms. Rhodes agreed to the buyout not just to end the payments to Crossland, but for other legitimate business reasons as well: she regained control of the 14 acres at an earlier date, and she avoided litigation over the excess rent to be paid by Staples.

Second, even if Ms. Rhodes had decided on her own to buy out Scotty's in her own best interest, including for the purpose of avoiding further payments to Crossland, this would not matter. *Plumbing Industry, Strano* and *Woodard Tire* were decided based on the terms of the continuing

relationship between the landlord and tenant and whether those terms constituted a new lease or a renewal of the existing lease. Whose idea it was, or why the terms were changed, had nothing to do with it. In the case at bar, the terms have changed dramatically. Beyond question, the original Lease will terminate at the end of 2006. Crossland's right to payment will end at that time.

*Fairness and Justice*

Finally, Crossland appeals to fairness and attacks Ms. Rhodes' purported lack of good faith. These assertions, too, do not carry the day.

Crossland first says that if it is not paid beyond 2006, it will not be fully compensated for the work it did. This seems unlikely; defendants assert, with substantial evidentiary support, that Crossland already has been paid far more than ordinarily would paid for the services Crossland provided. (*See* McCarble Affidavit (document 68, attachment 10).)

Crossland also asserts that if it is not paid beyond 2006, Ms. Rhodes will be unjustly enriched. That too seems unlikely; Ms. Rhodes will have received exactly what she contracted to receive as rent for property she owns, less payment of exactly the amounts that were to be paid for Crossland's services under the governing agreements.

More fundamentally, deciding how much Crossland should be paid for the work it did is not a job for the court after the fact. It was a job for the parties in advance. They made the contracts they made and now must live with them.

In that respect, it bears noting that Ms. Rhodes has done so. She has stuck with a deal that has paid Crossland quite handsomely for more than two decades and will continue to pay Crossland through 2006. When Scotty's suggested that Ms. Rhodes buy Scotty's interest, Ms. Rhodes agreed, and when the transaction went forward in that manner, Ms. Rhodes honored Crossland's contractual rights without fail. Ms. Rhodes made no effort to cancel the Lease immediately or to diminish or eliminate the payments to Crossland during the 26–year Lease term. Crossland thus has continued to receive its payments, now increased by $30,000 per year as a result of the increase in rent paid by Staples. And although Ms. Rhodes (through her nominee North Monroe Capital) paid $250,000 to buy Scotty's interest (and thus, in effect, to buy any claim Scotty's had to the increased rents paid by Staples), Ms. Rhodes has attempted to offset no portion of that $250,000 against the increased rents. Crossland thus has received 100% of its share of the increased rent received from Staples, without contributing in any way to Ms. Rhodes' purchase of Scotty's claim to those same funds.

In short, Ms. Rhodes acted in her own best interest, in complete accord with the parties' agreements and Florida law, and in complete good faith. Crossland has received exactly what it contracted to receive, no more and no less.

With this analysis of the fundamental issues as background, I address in turn each of the specific causes of action alleged by Crossland.

*Breach of Contract*

 Crossland's first cause of action is against Ms. Rhodes for breach of contract. Crossland asserts Ms. Rhodes entered an oral agreement to pay Crossland the amounts now at issue. This theory of recovery fails for two reasons.

First, under the written documents, Ms. Rhodes explicitly undertook no obligation to pay Crossland at all. To the contrary, the Lease specifically provided that only Scotty's, not Ms. Boone, was obligated to pay Crossland the agreed amounts, and that "Lessor shall have no obligation to Crossland hereunder ...." (Lease at 6

§ IV.) [10] The Lease said it constituted "the entire agreement between the parties," that there were no "warranties, representations, covenants, or agreements, *express or implied,* . . . other than those expressly set forth herein," and that no party had relied upon any "warranties, representations, covenants, or agreements other than those expressly set forth herein." (Lease at 21 § XXVII) (emphasis added). Finally, the Lease said its terms could not "in any manner be altered, waived, or changed, except by written instrument signed and delivered by the parties hereto." (Lease at 21 § XXVI.)

These provisions standing alone are sufficient to defeat Crossland's assertion that there was an oral agreement under which, contrary to the terms of the Lease, Ms. Rhodes was obligated to pay Crossland. *See, e.g., Federal Deposit Ins. Corp. v. Hemmerle,* 592 So.2d 1110, 1113–14 (Fla. 4th DCA 1991); *see also Ungerleider v. Gordon,* 214 F.3d 1279 (11th Cir.2000).

The second reason why this cause of action fails is more fundamental. Crossland asserts that the oral agreement differed from the written documents only with respect to *who* was obligated to pay Crossland, not with respect to the amount of any such payment or the terms under which any such payment would be due. Thus Crossland says that, although under the written documents Ms. Rhodes undertook no obligation to pay Crossland, under the oral agreement Ms. Rhodes did undertake such an obligation.

Even if true, this would not help Crossland. As set forth above, under the written documents, Crossland is entitled to payment only during the 26–year term of the Lease and during any extensions thereof. The Lease will not be extended. Under the written documents, Crossland is entitled to payment through 2006, but not

thereafter. Thus even if Ms. Rhodes herself were obligated to make any payments to which Crossland is entitled, this would not matter, because Crossland is not entitled to the payments at issue.

Nor does Crossland's invocation of the implied covenant of good faith change this. First, the duty of good faith does not alter the express terms of a contract. When parties enter a contract calling for payment only in specified amounts or on specified terms, a court cannot properly rewrite the contract in the name of good faith. *See Avatar Dev. Corp. v. De Pani Constr. Co.,* 834 So.2d 873, 876 (Fla. 4th DCA 2002); *Cox v. CSX Intermodal,* 732 So.2d 1092, 1098 (Fla. 1st DCA 1999).

Second, Crossland has shown no lack of good faith on the part of Ms. Rhodes. Scotty's closed its store, sought to modify its relationship with Ms. Rhodes, and eventually did so, on terms acceptable to both Scotty's and Ms. Rhodes. That Ms. Rhodes dealt with the Scotty's closure and further events in a manner serving her own economic interests hardly shows a lack of good faith. To the contrary, that Ms. Rhodes made no effort to interfere with Crossland's payments through 2006, but instead acted in a way that increased those payments, is an indication of good faith.

Ms. Rhodes has breached no contract, written or oral.

*Tortious Interference*

■ Crossland's second cause of action is against Mr. Rhodes and North Monroe Capital for tortious interference with Crossland's contractual right, or reasonable expectation, to receive continuing payments after 2006.

This claim fails for two reasons. First, as set forth above, Crossland had no con-

---

**10.** *See also supra* note 5.

tractual right or reasonable expectation to receive continuing payments after 2006. Interfering with a non-existent right or expectation is not actionable tortious interference. *See, e.g., Miller, Cowherd & Kerver, Inc. v. De Montejo,* 406 So.2d 1196 (Fla. 4th DCA 1981) (holding that broker whose contract called for commission on sale of property was not entitled to commission on transfer of property to partnership in which owner had an interest, and that because broker was not entitled to commission under terms of his contract, he also could not recover against a third person on theory of tortious interference with that contract).

Second, Mr. Rhodes and North Monroe Capital were not strangers to this transaction. Mr. Rhodes was acting as the attorney and agent for Ms. Rhodes. North Monroe Capital was formed after the deal was struck and took title to the leasehold interest acquired from Scotty's essentially as Ms. Rhodes' nominee. This was done for tax reasons and to avoid any claim that the fee and leasehold interests had merged as a matter of law, thus terminating the 26–year lease.[11]

A party to a contract cannot tortiously interfere with her own contract. *See, e.g., Cedar Hills Props. Corp. v. E. Fed. Corp.,* 575 So.2d 673, 676–77 (Fla. 1st DCA 1991) (holding that leasing agent "acting within his capacity and scope as an agent, cannot be considered to be a separate entity outside of the contractual relationship which can tortiously interfere with that relationship"); *see also Richard Bertram, Inc. v. Sterling Bank & Trust,* 820 So.2d 963, 965 (Fla. 4th DCA 2002) ("While an agent may be held personally liable for his or her tortious acts, even if committed within the scope of the agent's employment with the principal, an agent is not liable for tortious

interference with a contract of which his or her principal is a party.") (citations omitted); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 742 So.2d 381, 386 (Fla. 4th DCA 1999) ("For the interference to be unjustified, the defendant must be a third party, external to the business relationship" or an agent who "acts solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest."); *Babson Bros. Co. v. Allison,* 337 So.2d 848 (Fla. 1st DCA 1976) (holding that employee of one family-owned corporation who was assigned to terminate a contract of another corporation owned by the same family could not, as a matter of law, be held liable for tortious interference with the contract). This principle is fatal to Crossland's tortious interference claim against Ms. Rhodes' attorney and agent husband and against the corporation they formed to consummate this transaction.

*Unjust Enrichment*

■ Crossland's third cause of action is against Ms. Rhodes for unjust enrichment. This claim fails because Ms. Rhodes has not been unjustly enriched. She has received, instead, exactly what she contracted to receive, as rent on property she owns. Crossland has been paid precisely what Crossland contracted to be paid.

An action for unjust enrichment cannot be used relieve a party from the terms of the contract it entered. *See Kovtan v. Frederiksen,* 449 So.2d 1, 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter."); *Cf. Corn v. Greco,* 694 So.2d

---

11. Crossland is hardly in position to complain of Ms. Rhodes' effort to avoid such a merger. If the fee and leasehold interests had merged, thus terminating the 26–year Lease, Crossland's right to payments apparently would have ended *instanter.*

833, 834 (Fla. 2d DCA 1997) ("Quantum meruit relief is founded upon the legal fiction of an implied contract. This fiction cannot be maintained, however, when the rights of the parties are described in a written contract."); *Tobin & Tobin Ins. Agency v. Zeskind,* 315 So.2d 518, 520 (Fla. 3d DCA 1975) (recognizing that action for quantum meruit relief exists to avoid unjust enrichment); *George v. Tanner,* 108 Idaho 40, 696 P.2d 891, 894 (1985) (noting that the doctrine of unjust enrichment "does not operate to rescue a party from the consequences of a bargain which turns out to be a bad one."). Thus even if Crossland received less than the value it provided and Ms. Rhodes paid less than the value she received—an unlikely proposition—it would not matter, because the payment that has been made is the payment to which the parties agreed. *See generally Restatement (First) of Restitution* § 107(1) (1937) (one "who, pursuant to a contract with another, has ... conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded ....").

### Conclusion

Under the parties' contracts, Crossland was entitled to payment during the term of the original 26–year Lease and any renewals thereof. Crossland has been paid and will continue to be paid the agreed amounts during the 26–year term, but the Lease will not be extended thereafter, and Crossland's payments will end. In the transactions that led to this result, Ms. Rhodes acted consistently with the parties' agreements, the law of Florida, and her own best interests, as she was entitled to do. Accordingly,

IT IS ORDERED:

1. Defendants' motion for summary judgment (document 69) is GRANTED.

2. Plaintiff's motion for summary judgment (document 71) is DENIED.

3. The clerk shall enter judgment stating, "All claims are dismissed with prejudice." The clerk shall close the file.